## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AQUION ENERGY, INC., [1] | Case No. 17-10500 (KJC) |
| Debtor. | |

## DECLARATION OF SUZANNE ROSKI, CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF FIRST DAY MOTIONS

I, Suzanne Roski, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am a Managing Director in the Richmond, Virginia office of Protiviti Inc. ("Protiviti"), a global consulting firm which serves clients through the network of Protiviti offices and independently owned Member Firms in more than 70 offices and over 20 countries.  I joined Protiviti in 1999.  I have over thirty years of professional experience and have held positions in professional services consulting, public and private companies, and public accounting.  As of the Petition Date, I am the Chief Restructuring Officer, President and Treasurer of Aquion Energy, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor").  I submit this declaration (the "Declaration") in support of the Debtor's petition and "first day" motions and pleadings, described further below (collectively, the "First Day Motions").  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, or my opinion based on my experience with the Debtor's operations and financial condition.  In making my statements based

---

[1]      The Debtor in this chapter 11 case and the last four digits of the Debtor's U.S. tax identification number is Aquion Energy, Inc. (1370).  The Debtor's headquarters is located at 32 39th Street, Pittsburgh, PA, 15201.

on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees accurately recording, preparing or collecting such documentation and other information.

2.    If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this Declaration on behalf of the Debtor.

3.    Part I of this Declaration describes the business of the Debtor and the developments that led to its filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Part II sets forth the relevant facts in support of the First Day Motions filed by the Debtor concurrently herewith in support of its chapter 11 case.  Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

## PART I

## BACKGROUND

**A.    Background and General Description of the Debtor**

I.    **The Debtor's Business**

4.    The Debtor manufactures saltwater batteries with a proprietary, environmentally-friendly electrochemical design.  The Debtor's batteries are used for stationary energy storage in a variety of applications and are suitable for use in pristine environments, island locations, homes and businesses.  The Debtor's batteries contain no heavy metals or toxic chemicals and are non-flammable and non-explosive.  The Debtor's batteries have been Cradle to Cradle Certified™, an environmental sustainability certification that has never previously been given to a battery producer.

5.      Based in Pittsburgh, the Debtor was founded in 2008 by Jay Whitacre, PhD, at Carnegie Mellon University.  The Debtor had its first commercial product launch in 2014.  As of 2016, the Debtor's annual revenues exceeded $10 million.  The Debtor has product installations worldwide currently across a variety of applications, as described below.

6.      The Debtor's "Aspen" batteries applications include the following:

a.      Telecommunications.  Aspen batteries are heat tolerant and thus suitable for use in remote telecommunications towers providing cellular service.  The batteries supply reliable telecommunications power supply for "off-grid" and weak-grid sites.

b.      Microgrid Energy Storage.  Aspen batteries can power a small network of electricity users that can function independently of a centralized national grid.  Microgrids range in generating capacity from kilowatts to megawatts and provide power to a variety of applications, from small cell phone towers to large commercial, industrial, and military installations.

c.      Off-Grid Lighting.  When paired with LED lighting or solar power, Aspen batteries provide reliable, cost-effective indoor and outdoor illumination. Such "off-grid," self-sustaining energy systems eliminate the cost of extending grid power or continually purchasing, transporting, and burning diesel fuel.

d.      Commercial & Industrial Energy Storage.  Commercial and industrial energy storage enables storage and dispatch of energy on demand to avoid using grid power at the costliest times of day.

e.    <u>Grid Energy Storage</u>.  Grid energy storage systems are designed to augment or replace generation, transmission, and distribution assets across the grid.  These large, "utility-side of the meter" systems can make the grid more reliable and more flexible by decoupling energy services from a particular fuel source.  The Debtor's Aspen batteries are designed such applications to enable bulk energy shifting and grid resiliency.

f.    <u>Green Residential and Commercial Building Energy Storage</u>.  Batteries such as the Debtor's Aspen batteries are installed to maximize a green residential or commercial building's use of solar power and for backup power.

7.    The Debtor distributes its batteries primarily through a network of dealers and distributers which sell and install the Debtor's batteries to the end customers.  For large-scale commercial, industrial, utility, and OEM applications, the Debtor works directly with customers to design and implement high-performance energy storage systems.  The Debtor's batteries may also be sold as components of systems which include the Debtor's batteries in conjunction with third party equipment.

8.    The Debtor's battery technology has won multiple prestigious awards including *Popular Science Best of What's New Innovation of the Year* (2014), *MIT Technology Review 50 Smartest Companies* (2015), *Global Cleantech 100 North American Company of the Year* (2017), among others.  Aspects of the Debtor's batteries and manufacturing processes are protected as trade secrets and, therefore, cannot be reverse-engineered.  The Debtor has patents

granted and/or pending in the United States, Australia, Japan, Taiwan, China and Europe, among others.

9.    The Debtor is headquartered in Pittsburgh, Pennsylvania. Its other significant facilities are 330,000 square feet of manufacturing space in Mt. Pleasant, Pennsylvania and a 29,000 square-foot manufacturing/warehouse facility in Belle Vernon, Pennsylvania. All of the Debtor's facilities are leased. As of the Petition Date, the Debtor has recently reduced its workforce to a total of approximately 19 full-time employees and 12 part-time employees/consultants. As further discussed below, shortly prior to the Petition Date, the Debtor terminated substantially all of its former employees, each of whom were paid, as of the termination date, their respective outstanding wages, accrued paid time off, and certain payments that would be credited to the extent the Debtor were adjudicated to have any liability under any federal or state WARN act statutes.

10.    A further description of the Debtor's business can be found at the Debtor's website at: http://aquionenergy.com.

## II.    Capital Structure

11.    The Debtor is a privately-owned Delaware corporation. The Debtor's equity is held in various issuances/classes of preferred and common stock. Among the Debtor's primary equity investors are: KPCB Holding, Inc.; Foundation Capital VI, LP; Advanced Technology Ventures VII, L.P.; Onwell Enterprise Holdings, Inc.; Tao, LLC; Gates Ventures, LLC; DNS-AQN, LLC; Constellation NewEnergy, Inc.; and Total Energy Ventures International, S.A.S, among others. More than $180 million of equity capital was raised prepetition, including a management-led effort as recently as November 2016.

12.     As described below, the Debtor believes its assets have substantial value which can be realized through a sale process. As of the Petition Date, the Debtor's cash balance is approximately $6.2 million.

13.     In May 2014, the Debtor entered into the *Master Loan and Security Agreement*, dated as of May 1, 2014, as amended, supplemented or otherwise modified from time to time prior to the date hereof (the "Trinity Loan Agreement" and together with all agreements, documents, notes, security agreements, pledges, guarantees, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Trinity Loan Documents") with Trinity Capital Fund II, L.P. ("Trinity")[2] as lender to provide term loans totaling up to $20.0 million. The obligations under the Trinity Loan Agreement mature on the last day of the forty-second (42nd) month following the date of the initial term note.

14.     All of the obligations owing to Trinity under the Trinity Loan Agreement are asserted to be secured by liens (the "Prepetition Liens") on substantially all of the Debtor's assets (the "Prepetition Collateral"), including cash collateral as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"). The Prepetition Liens are subject to certain "Permitted Liens" as defined in the Trinity Loan Agreement, which include, among other items: (a) purchase money security interests or liens in connection with operating or capital leases for equipment and loans for equipment not exceeding Twelve Million Dollars ($12,000,000) in principal amount outstanding at any time; (b) liens on accounts receivables or inventory securing working capital debt facilities not to exceed Five Million Dollars ($5,000,000) in principal amount outstanding at any time; and (c) liens securing certain permitted scheduled debt.

---

[2] All references to Trinity herein include CapXFund IV, L.P., which is not a lender, but is a participant in the loans extended under the Trinity Loan Agreement.

15.     As of the Petition Date, the Debtor's obligations under the Trinity Loan Documents totaled no more than $4,409,538 in principal obligations, plus an "End of Term Payment" in the amount of $750,000 or 5% of the original balance of term notes (total advances were originally $15.0 million).

16.     As of the Petition Date, the Debtor has certain outstanding purchase money secured indebtedness in the aggregate principal amount of approximately $6.1 million that is secured by the Debtor's equipment.

17.     As of the Petition Date, the Debtor's preliminary estimate of general unsecured debt totals approximately $14 million, which estimate is subject to change and includes potential unliquidated and/or contingent claims.

**B.     Events Leading to the Bankruptcy Filing and Commencement of the Chapter 11 Case**

18.     The Debtor's unique and ground-breaking technology has not generated sufficient sales to offset its start-up and operating costs and achieve profitability.  The Debtor's EBITDA for year-end 2015 and 2016 constituted losses of approximately $38.4 million and $31.0 million, respectively.  The Debtor's tenuous financial condition has impeded its ability to raise sufficient additional capital on terms that will enable the Debtor to continue operations.

19.     Absent significant cost-cutting measures, the Debtor's cash burn at full operation is unsustainable and would almost immediately drive the Debtor into a forced liquidation.  Accordingly, as of the Petition Date, the Debtor has ceased its manufacturing and marketing operations and is no longer selling its products.  Moreover, the Debtor has reduced its employee headcount by about 85%.  As noted above, approximately 19 full-time employees and 12 part-time employees/consultants will assist to transition the Debtor in chapter 11 and to

continue operations only as necessary to preserve and maximize the value of the assets pending a sale process in chapter 11.

20.    In October 2016 the Debtor engaged Citi Global Markets, Inc. ("Citi") as investment bankers to undertake a marketing process for the Debtor or its assets or a capital raise.  During the pendency of Citi's engagement, the Debtor attracted several interested parties.  However, Citi was unsuccessful in raising capital or attracting a successful buyer.  The Debtor is continuing its own marketing process for its assets.  As of the Petition Date, the Debtor is engaged in active discussions with several potential buyers.  The Debtor has an electronic data room available to potential bidders and is in different stages of diligence and negotiations with interested parties.  The Debtor conducted diligence visits or had telephonic communications with interested parties as recently as the week prior to filing.  Postpetition, the Debtor intends to reach out to several potential bidders who were not interested in purchasing the Debtor's assets outside of bankruptcy.  The Debtor's representatives will continue these individual contacts as well as "blast" electronic communications informing potentially interested parties of the Debtor's chapter 11 filing and its renewed sales effort.  The Debtor will seek to undertake a robust, yet expedited, sales process in chapter 11.  The Debtor believes it has sufficient cash on-hand to fund such a sale process and that it is likely to result in the best outcome for the estate and its stakeholders.

## PART II

## FIRST DAY MOTIONS AND APPLICATIONS

21.    In order to enable the Debtor to minimize the adverse effects of the commencement of the chapter 11 case, the Debtor has requested various types of relief in the

First Day Motions filed simultaneously with this Declaration. A summary of the relief sought in each First Day Motion is set forth below.

22.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption; and (b) is essential to maximizing the value of the Debtor's assets for the benefit of its estate and creditors.

**A.      Motion of Debtor for Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing (the "Cash Collateral Motion")**

23.     A summary of the Debtor's prepetition capital structure is set forth in paragraphs 11-17, above, and is incorporated herein.

24.     I believe that only Trinity asserts an interest in the Debtor's Cash Collateral. The Debtor has an urgent and immediate need for the use of Cash Collateral in which Trinity has, or asserts, an interest. The Debtor has not obtained post-petition financing and, without the use of Cash Collateral, the Debtor will not be able to preserve its assets or to effectuate an orderly sale process that will maximize value for creditors. The urgent need to preserve the Debtor's business, and avoid immediate and irreparable harm to the Debtor's estate, makes it imperative that the Debtor is authorized to use the Cash Collateral as of the Petition Date, pending the final hearing on use of Cash Collateral, in order to continue its business and administer the chapter 11 case.

25.     As discussed herein, the Debtor has reduced its workforce to a skeletal staff of 19 full-time employees and 12 part-time contractors, consisting primarily of engineering and technical experts who possess the requisite knowledge to maintain the Debtor's technologically advanced assets and otherwise maximize the value of those assets for sale. In order to effectively administer the case, therefore, the Debtor needs the ability to fund, among other things, payroll for its remaining employees and contractors, payments to vendors for ongoing goods, services, and rent, and other administrative obligations.

26.     The Debtor can only fund its necessary obligations if it is authorized to have immediate access to Cash Collateral. Without immediate access to Cash Collateral, the Debtor would be forced to immediately terminate all remaining staff, abandon its equipment and inventory, and cease operations. In that event, the Debtor's only alternative would be a piecemeal liquidation that I believe would substantially handicap recoveries by creditors.

27.     Assuming that Trinity has a valid, enforceable, and properly perfected security interest in the Debtor's Cash Collateral, I believe that Trinity's interests in the Debtor's assets are adequately protected based upon the proposed terms for the Debtor's use of Cash Collateral for the following reasons, as set forth in the Cash Collateral Motion:

- First, as discussed above, Trinity is oversecured. The Debtor intends to maintain a sufficient amount of cash in its deposit and securities accounts to pay Trinity's asserted secured claim in full, plus the adequate protection payments contemplated by the Cash Collateral Motion, subject to the Debtor's right to seek an order of this Court providing otherwise at a later date.

- Second, access to Cash Collateral will maximize the value of the Debtor's assets through the knowledge and expertise of the Debtor's remaining employees.

- Third, the Debtor has proposed further adequate protection in the form of the liens, claims and ongoing cash payments as described in the Cash Collateral Motion.

28.     For the foregoing reasons, I believe that the relief sought in the Cash Collateral Motion is fair and reasonable and will compensate Trinity for any possible diminution in value of the Debtor's assets.  Moreover, I believe that, given the significant value that the Debtor stands to lose in the event that it is denied access to continued use of Cash Collateral, such protections are appropriate and justified.

**B.     Motion of Debtor for Order Under Sections 105, 345, 363, 1107 and 1108 of the Bankruptcy Code Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; and (iii) Granting Related Relief (the "Cash Management Motion")**

29.     By the Cash Management Motion, the Debtor seeks authorization for the (i) maintenance of existing bank accounts, including the authority to pay routine prepetition banking fees owed to financial institutions; (ii) continued use of the Debtor's existing cash management system, bank accounts, and checks (the "Cash Management System").  The Debtor maintains a simple cash management system, bank accounts, and checks (the "Cash Management System"), consisting of only three bank accounts.  The Debtor has two deposit accounts:  a deposit and operating account at Silicon Valley Bank (account ending in 7066) (the "SVB Deposit Account") and another deposit account at PNC Bank (account ending in 5503) (the

"PNC Deposit Account"). The Debtor also maintains an investment account at Silicon Valley Bank (accounting ending in 3483) (the "SVB Investment Account"), and described more fully below. To the best of my knowledge a correct list of the Debtor's three bank accounts (collectively, the "Bank Accounts") is set forth on Exhibit A to the Cash Management Motion. A schematic diagram of the Cash Management System is attached as Exhibit B to the Cash Management Motion.

30.     As more fully explained below, the Cash Management System is designed to effectuate the collection of revenue from customers, pay operating expenses, and pay down its secured indebtedness to its secured lender Trinity. I believe that any disruption caused by requiring the Debtor to close and open new bank accounts and establish a new cash management system would jeopardize the Debtor's ability to satisfy postpetition obligations and maintain its relationships with customers.

31.     The SVB Deposit Account is the Debtor's primary deposit account and also serves as the Debtor's only operating account. All deposits (except for deposits that cannot be made electronically and which are deposited into the PNC Deposit Account) are made to the SVB Deposit Account. All disbursements, including vendor, employee payroll, and tax disbursements, are made from the SVB Deposit Account, either electronically or by paper checks. Prepetition, the SVB Deposit Account maintained an average balance ranging between $1.2 million and $3.6 million. Amounts are transferred to the SVB Deposit Account from the SVB Investment Account on an as-needed basis in order to fund certain disbursements made by the Debtor, such as payroll funding or other large expenditures.[3] As of the Petition Date, the SVB Deposit Account maintained a balance of approximately $1.0 million.

---

[3] The Debtor's payroll funding and disbursement schedule is summarized below.

32.     The PNC Deposit Account is a stand-alone account that only receives deposits for checks that cannot be deposited electronically into the SVB Deposit Account. Prepetition, deposits into the PNC Deposit Account ranged between $0 to approximately $40,000 per month.  Amounts deposited into the PNC Deposit Account are periodically transferred by the Debtor to the SVB Deposit Account.  As of the Petition Date, the PNC Deposit Account maintained a balance of approximately $4,500.

33.     Prepetition, funds in the SVB Investment Account were primarily invested in money market and large cap investments through an investment fund managed by Silicon Valley Bank.  Amounts are wired from the SVB Investment Account to the SVB Deposit Account on an as-needed basis.  As of the Petition Date, the SVB Investment Account held approximately $5.2 million.

34.     If strictly enforced in this case, the United States Trustee's requirement to close and open new accounts would cause a severe disruption in the Debtor's activities and would impair the Debtor's ability to operate under chapter 11.  Maintenance of the Bank Accounts and the Cash Management System will greatly facilitate the Debtor's operations in chapter 11.  The continued maintenance of the Bank Accounts is of paramount importance because the accounts are used to collect revenues and effectuate payments to employees and vendors.

35.     If the Bank Accounts were closed, the Debtor would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments into and out of the Debtor's accounts, which would disrupt the flow of postpetition receipts and disbursements.  In addition, closing the Bank Accounts would require the Debtor to cancel and reinstitute wire transfer instructions which would be difficult to modify under exigent

circumstances. This disruption would severely impact and could irreparably harm the Debtor's ability to operate at this critical juncture. The Debtor should be permitted to maintain its existing Bank Accounts and, if necessary, open new accounts as debtor-in-possession accounts, and/or close any unneeded existing Bank Accounts.

36.    To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Debtor will promptly notify each bank at which a Bank Account resides not to honor checks drawn on the Debtor's accounts before the Petition Date, except upon limited Court-approved exceptions.

37.    If the relief requested in the Cash Management Motion is granted, the Debtor will not pay, and each of the banks where the Bank Accounts are maintained will be required not to pay, any debts incurred before the Petition Date, other than as specifically authorized through the Cash Management Motion or otherwise ordered by the Court.

38.    For the reasons set forth above, the Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtor in the exercise of its business judgment. The Cash Management System provides numerous benefits including the ability to (a) receive customer payments; (b) allow a mechanism for deposits; (c) payment of employee wages and benefits; and (d) payment of vendors. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System.

39.    In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor incurs routine bank charges and fees relating to the administration of the Cash Management System. While it is difficult to readily determine the

aggregate amount of unpaid prepetition banking fees as of the Petition Date (given, for example, the applicable banks' varying timing of charging/deducting such fees from a given account), on average, the Debtor pays approximately $150 in monthly banking fees and charges.

40.     It may take up to three weeks for the Debtor to alter its software to provide for the insertion of "debtor in possession" on postpetition purchase orders and invoices.

**C.     Motion of the Debtor for Entry of Interim and Final Orders Under Section 366 of the Bankruptcy Code (a) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (b) Deeming Utility Providers Adequately Assured of Future Performance, (c) Establishing Procedures for Determining Adequate Assurance of Payment and (d) Granting Related Relief**

41.     In connection with its business, the Debtor has relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, cable, gas, electricity, water, waste disposal and related services (the "Utility Services"). The Utility Providers include, without limitation, the entities set forth on the list (the "Utility Services List") attached to the Motion as Exhibit A.

42.     Uninterrupted Utility Services are essential to the Debtor's restructuring and sale process. The Debtor requires electricity for lighting, gas for heating, water, waste management and disposal, telephone, and internet services. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's restructuring could be severely disrupted, and such disruption would jeopardize the Debtor's bankruptcy cases. Accordingly, it is essential that the Utility Services continue uninterrupted during the chapter 11 case.

43.     The Debtor intends to pay postpetition obligations owed to the Utility Providers in a timely manner.  I believe that cash held by the Debtor will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with prepetition practice.

44.     The Debtor's estimated average monthly payments to the Utility Providers aggregate approximately $24,000.

**D.**  **Motion for Entry of an Order Authorizing the Debtor to (i) Pay and/or Honor Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (ii) Remit Withholding Obligations and Deductions; (iii) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (iv) Have Applicable Banks and Other Financial Institutions Receive, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests (the "Employee Wage and Benefits Motion")**

45.     By the Employee Wage and Benefits Motion, the Debtor seeks to minimize the personal hardship to its remaining employees (collectively, the "Employees") as a result of the filing of this chapter 11 case and to minimize the disruption to the Debtor's operations.  To accomplish this, the Debtor requests, in its sole discretion, the authority (a) to pay and honor, *inter alia*, certain prepetition claims of its employees for wages, salaries, and compensation (the "Wages"), (b) pay and honor employee benefits and expense reimbursements (collectively, the "Benefits" and, together with Wages, the "Wages and Benefits"), (c) remit withholding obligations and employee deductions, and (d) to continue to pay and honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtor's business.

*General Employee Overview*

46.     Prior to the Petition Date, the Debtor employed approximately 143 employees.  Shortly before the Petition Date, the Debtor terminated substantially all of its former employees (the "Terminated Employees"), each of whom were paid, as of the termination date, their respective outstanding wages, accrued paid time off, and payment of three weeks' salary that would be credited to the extent the Debtor were adjudicated to have any liability under any federal or state WARN Act statutes.[4]  As of the Petition Date, the Debtor employed approximately nineteen Employees.  Prepetition, the Debtor also entered into consulting agreements with twelve of the Terminated Employees (collectively, the "Contractors"), pursuant to which the Contractors agreed to perform certain services on behalf of the Debtor as independent contractors.  The Contractors will be paid on an hourly basis and will assist the Debtor with its continued efforts to effectuate a sale of its business.  I believe that the consulting arrangements with the Contractors is in the best interest of the Debtor and its estate because the Debtor will only have to pay the Contractors, who already possess an expertise of the Debtor and its business, an hourly wage in exchange for the Consultants' services, rather than having to pay full-time salaries and associated health and welfare benefits.

47.     I believe that the Debtor has paid all outstanding prepetition Wages owed to Employees and that the Debtor will have sufficient funds available postpetition, through the use of the cash collateral of its secured lender, to pay or honor all Wages and Benefits, to the extent described in the Employee Wage and Benefits Motion, on an ongoing basis and in the ordinary course of business and subject to the applicable limits under section 507(a) of the Bankruptcy Code.  Consequently, I do not believe that there is any reason for the regular

---

[4]  Except for in the case of one international employee who received that country's required redundancy payment of four weeks and an additional payment of two weeks in lieu of notice.

payment of Wages and Benefits to be disrupted, which would directly harm the Debtor's Employees.

*The Debtor's Payroll Schedule and Payroll Amounts*

48.    Prepetition, the Debtor's Employees were paid one-week in arrears on a bi-weekly basis every other Friday. Thus, on the applicable bi-weekly Friday pay date, all Employees would still be owed one week's Wages, which would be paid in the next payroll cycle. However, immediately prior to the Petition Date, the Debtor issued a special payroll and paid (i) the outstanding prepetition Wages, accrued paid time off, and other amounts to the Terminated Employees as explained above, and (ii) the outstanding prepetition Wages owed to the Employees earned through the Petition Date. Thus, as of the Petition Date, I do not believe the Employees are owed any prepetition Wages. Going forward, the Debtor will resume its normal bi-weekly payroll schedule whereby Employees will be paid every other Friday (the "Bi-Weekly Paydate"). Thus, the next Bi-Weekly Paydate will occur on March 24, 2017, upon which date the Debtor will pay Wages owed through March 17, 2017.

49.    Postpetition, the Debtor's aggregate bi-weekly gross payroll for Employees is approximately $65,000. The Debtor's bi-weekly payroll (including applicable employee and employer tax amounts) is generally funded by the Debtor to its payroll processor, Paychex, Inc. ("Paychex") two days prior to the Bi-Weekly Paydate. Paychex then remits the Employees their net Wages. Paychex also remits the applicable tax payments and involuntary Deductions (*i.e.*, garnishments and judgments) paid by the Debtor and withheld by the Employees to the appropriate taxing and governmental jurisdictions. Thus, the only amounts directly withheld by the Debtor from Employees' Wages are the voluntary Deductions. On a monthly basis, the Debtor pays Paychex approximately $2,000 in fees to process payroll.

50.    To the best of my knowledge, no payments to any single Employee on account of prepetition Wages as proposed in the Employee Wage and Benefits Motion will exceed the $12,850 cap of section 507(a)(4) of the Bankruptcy Code.

*Gross Pay Deductions and Payroll Taxes*

51.    For each applicable pay period, the Debtor routinely deducts certain amounts from each Employee's gross payroll, including, without limitation, garnishments, child support, spousal support, and similar deductions and other pre-tax and post-tax deductions payable pursuant the employee benefit plans discussed herein (including, for example, the Employee's share of health care benefits, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions, and miscellaneous deductions) (collectively, the "Deductions"). On average, the Debtor's prepetition Deductions totaled approximately $63,000 each pay period, which the Debtor remits to the appropriate third-party recipients. The Debtor has not yet forwarded all of the prepetition Deductions to the appropriate third party recipients made pursuant to the special payroll prior to the Petition Date. The amount of the Deductions will also decrease postpetition as a result of the separation of the Terminated Employees from the Debtor.

52.    In addition to the Deductions, federal and state laws require the Debtor to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Withholding Obligations"). The Debtor must also pay, from its own funds, for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "Employer Payroll Taxes," and, together with the Withholding Obligations, the "Payroll Taxes"). In the aggregate, the Payroll

Taxes, including both the Employee and employer portions, totaled approximately $100,000 per pay period prepetition. Postpetition, the amount of the Debtor's Payroll Taxes will decline as a result of the Terminated Employees no longer being employed by the Debtor.

*Reimbursable Expenses*

53.    Employees customarily incur business expenses in the ordinary course of performing their duties on behalf of the Debtor. Such expenses may include, but are not limited to, cell phone expenses and business-related travel expenses, including air travel, car rental, lodging, meal charges, ground transportation, and miscellaneous other allowed travel expenses (the "Reimbursable Expenses").

54.    Generally, Employees pay for the Reimbursable Expenses personally and submit expense report forms to the Debtor for reimbursement. In some cases, Employees may not have submitted reimbursement requests in time to have been processed prior to the Petition Date. In the aggregate, the Employees incur, on average, approximately $10,000 per month in Reimbursable Expenses.

*Third Party Service Providers*

55.    The Debtor employs the services of certain third parties that provide certain services for the Debtor (the "Third Party Providers"). Houk Consulting provides intellectual technology support to the Debtor, including a help desk for employees and server maintenance. I believe that the Debtor owes approximately $10,000 of pre-petition amounts outstanding to Houk Consulting. The Debtor also has a consulting agreement with Elektroda for consultant Jay Dandrea, who provides the Debtor with critical support for battery fundamentals and current collector development and whom I believe that the Debtor owes approximately

$26,000 on account of prepetition services.  The Debtor requires the services of these Third Party

Providers postpetition.

*Health Benefits*

56.     The Debtor provides health insurance to Employees, including medical,

dental, vision, disability, COBRA, flexible spending accounts, health reimbursement accounts,

and dependent care benefits (collectively, the "Health Plans"), as described in more detail below.

Each pay period, Employees make contributions toward the Health Plan premiums for medical,

dental and vision coverage, and the Debtor deducts the Employees' portions of the premiums, if

applicable, owing under the Health Plans from their Wages as Deductions.

Medical Plan

57.     The Debtor maintains a premium-based medical plan policy issued by

UPMC (the "Medical Plan").  The Medical Plan is a preferred provider organization (PPO) and

provides both in-network and out-of-network benefits.  The in-network deductible is $3,500 per

person and $7,000 per family, and requires Employees to make co-pay amounts and also pay for

other expenses for certain specified medical services and prescription drugs.  The out-of-network

service deductibles are $7,000 per person and $14,000 per family.  In addition to the higher

deductibles, out-of-network services also require the payment of co-insurance payments of up to

20% of the medical expense once the deductible amounts are reached, subject to a maximum of

$10,000 per person and $20,000 per family.[5]  As noted above, Employees are responsible for a

percentage of the costs of the Medical Plan, which amounts vary depending on the level of the

coverage and whether the Employee's spouse and family participate in the Medical Plan, as set

forth below:

---

[5]  As explained below, the Debtor offers a health reimbursement account by which it will pay a portion of the in-network deductible amounts under the Medical Plan to help Employees defray the costs of medical coverage.

| Single | $15.48 - $18.48 per pay period |
|---|---|
| Employee and Spouse | $115.10 - $153.52 per pay period |
| Employee and child/children | $62.15 - $91.04 per pay period |
| Family | $124.20 - $164.26 per pay period |

58.     The Debtor pays approximately $67,000 in monthly premiums to UPMC on account of the Medical Plan (exclusive of the Employee Deductions).  The March premium amount for the Medical Plan has not yet been paid.

### Dental Plan

59.     The Debtor provides Employees with dental insurance through a premium plan issued by Delta Dental (the "Dental Plan").  The Dental Plan is partially funded through contributions from participating Employees as Deductions, with the Debtor funding the remaining premium amounts.  The Dental Plan contains deductible amounts ($50 per Employee and $150 per family) and offers several types of in-network and out-of-network dental services. Participating Employees pay $2.42 (individual); $4.52 (Employee plus one other individual); $4.13 (Employee plus children); and $6.45 (Employee and family), on account of Employee contributions to the Dental Plan.  Maximum annual benefits under the Dental Plan are $2,000 per participating member.

60.     The Debtor pays (exclusive of Employee contributions) approximately $7,500 in monthly premiums to Delta Dental on account of the Dental Plan.  The March premium amount for the Dental Plan has not yet been paid.

### Vision Plan

61.     The Debtor also provides Employees with vision insurance through a premium policy issued by Eye-Med (the "Vision Plan").  The Vision Plan provides several types

of services, including eyeglass lenses, frames, contact lenses, laser vision, and eye exams. The Vision Plan is partially funded by Employees (for each pay period, either $1.32 per Employee or $3.36 for Employee and family) through Deductions.[6] The Debtor pays for the remainder of the premium amounts owed under the Vision Plan. The Debtor pays (exclusive of Employee contributions) approximately $1,100 in monthly premiums to Eye-Med on account of the Vision Plan. The March premium amount for the Vision Plan has not yet been paid.

### COBRA Benefits

62.    The Consolidated Omnibus Budget Reconciliation Act ("COBRA") gives workers and their families who lose their health benefits the right to choose to continue the group health benefits provided by their group health plan for limited periods of time under certain circumstances, such as voluntary or involuntary job loss, reduction in the hours worked, transition between jobs, death, divorce, and other life events. Qualified individuals are generally required to pay the entire premium for coverage, up to 102 percent of the cost to the plan.

63.    COBRA generally requires that group health plans sponsored by employers with 20 or more employees in the prior year offer employees and their families the opportunity for a temporary extension of health coverage (called continuation coverage) in certain instances where coverage under the plan would otherwise end. Former Employees electing to receive COBRA benefits pay a fixed premium to UPMC, the Debtor's COBRA administrator. These former Employees fund 102 percent of the cost of their health plan. As of the Petition Date, the Debtor is unaware of any outstanding prepetition administrative COBRA fees that may be owed.

---

[6] In addition to the premium amounts, Employees also pay additional costs under the Vision Plan depending on the nature of the service provided.

Flexible Spending Accounts

64.     The Debtor offers eligible Employees the ability to contribute a portion of

their pre-tax compensation to pay for certain health care and expenses or dependent care

expenses through a program (the "Flexible Spending Account Program") managed by Health

Equity.  Flexible spending accounts are funded with Deductions from participating Employees'

pre-tax payroll, with maximum annual contributions of $5,000 for health care expenses and

$5,000 for dependent care expenses to pay eligible expenses for dependent children, elderly

parents, or other eligible family members, all pursuant to applicable IRS guidelines.  The Debtor

withholds approximately $45,000 per month to fund participating Employees' flexible spending

accounts as Deductions.  In addition, the Debtor pays Health Equity approximately $3.95 per

Employee participant per month in fees to administer the Flexible Spending Account Program.

Health Reimbursement Accounts

65.     The Debtor provides Employees with a Health Reimbursement

Arrangement (the "HRA"), which is a program funded by the Debtor help defray the costs of the

Employees' in-network service deductibles required under the Medical Plan.  Under the HRA,

after the Employee pays the first $1,500/$3,000 of the applicable deductible for in-network

services, the Debtor then pays the remainder portion of the in-network deductible, as follows:

|  | Annual In-Network Deductible | Debtor's funding amount |
|---|---|---|
| Indiv. Plan | $3,500 | $2,000 |
| Family Plan | $7,000 | $4,000 |

*Life Insurance, Accidental Death & Dismemberment, and Disability Plan*

66.     The Debtor provides basic life insurance coverage of a $50,000 benefit to

Employees (the "Basic Life Insurance Plan") through Sun Life Financial at no cost to

Employees.  The Debtor also provides Employees with the option to purchase supplemental life insurance in $10,000 increments to a maximum benefit of $500,000, or five times the Employee's annual earning, subject to certain limitations (the "Supplemental Life Insurance Plan").  The Debtor pays all premiums in connection with the Basic Life Insurance Plan.  The entire amount of the premiums for the Supplemental Life Insurance Plan is withheld from the participating Employee's pay as Deductions.

67.    The Debtor also provides eligible Employees with life and accidental death and dismemberment insurance (the "AD&D Plan").  Each Employee is eligible for up to $100,000 of accidental death and dismemberment insurance under the AD&D Plan.  Additionally, the Debtor provides short term and long term disability insurance to its eligible employees (the "Employee Disability Plan").  For short term disability benefits, Employees are entitled to 60% of their weekly earnings up to $1,500 per week for a maximum of twelve weeks.  With respect to long term disability benefits, Employees are entitled to 60% of their monthly earnings up to $7,500 per month, subject to the terms and conditions of the Employee Disability Plan.  The AD&D Plan and Employee Disability Plan are both offered through Sun Life Financial and are paid entirely by the Debtor.

68.    The Debtor remits approximately $7,000 per month to Sun Life Financial on account of premiums and administrative fees owed under the Basic Life Insurance Plan, the AD&D Plan, and Employee Disability Plan.

*Holidays and Vacation*

69.    The Debtor pays for nine paid holidays per year for its Employees.  The Debtor also provides its Employees paid time off ("PTO").  Employees who have worked between 0 and 5 years for the Debtor are allotted 176 hours of PTO (and accrue 6.769 of PTO

hours per pay period) and Employees with five years of service or more are allotted 216 PTO

hours (and accrue 8.307 hours of PTO per pay period).  Employees may carry over up to a

maximum of 80 hours of unused PTO upon the Employee's anniversary date.

*401k Plan*

70.    The Debtor provides Employees with a 401(k) retirement plan (the

"401(k) Plan") through Eastern Benefits.[7] The Debtor does not match Employee contributions.

Employee contributions are withheld from paychecks as Deductions and remitted by the Debtor,

on the behalf of Employees, to Eastern Benefits.

71.    The Debtor pays Eastern Benefits approximately $650 per quarter to

administer the 401(k) Plan.  In addition, the Debtor pays an annual fee to Baker Tilly Virchow

Krause, LLP in order to audit the 401(k) Plan.  The annual audit fee is approximately $7,500.  I

believe that the Debtor is current on its obligations to Eastern Benefits and to the 401(k) Plan

auditor.

*Employee Assistance Program*

72.    The Debtor offers an employee assistance program ("EAP") to

Employees.  The EAP is a confidential information, support and referral service with respect to a

number of issues, including marital concerns, stress management, depression, grief, financial

referrals, relationship issues, parenting, substance abuse, and legal referrals.  EAP services are

available to Employees and their household members at no cost.  The Debtor does not incur any

additional costs to provide the EAP to Employees.

*Short Term International Travel*

73.    The Debtor provides emergency and urgent care medical benefits and

health-related services to Employees traveling on business for a period of six months or less (the

---

[7] Benefits Plans Administrative Services is the portal through which Eastern Benefits manages the 401(k) Plan.

"Short Term International Travel Program"). Benefits include: emergency medical evacuations, medical provider referrals, translation services, and assistance with lost or stolen travel documents. The Short Term International Travel Program is available to Employees under the age of 70 who are traveling internationally on behalf of the Debtor and provides up to $500,000 in benefits per calendar year. No prepetition amounts are owed under the Short Term International Travel Program.

*Workers' Compensation Insurance*

74.    Under the laws of various states, the Debtor is required to maintain workers' compensation insurance to provide Employees with coverage for injury claims arising from or related to their employment with the Debtor. The Debtor obtains workers' compensation insurance ("WC Policy") through Zurich American International Insurance Company (the "WC Insurer"). Under the WC Policy, the Debtor's liability under the WC Policy is limited to the insurance premium payments made under the WC Policy. Thus, the Debtor does not administer or pay workers' compensation claims. I am aware of only one pending workers' compensation claim under the WC Policy and am not aware of any open legacy workers' compensation claims under prior policy periods.

75.    The annual premium for the Debtor's workers compensation insurance is $197,026. The Debtor finances this annual premium under a financing agreement with Bank Direct Capital Finance. I believe that all premium amounts for the policy period owed under the WC Policy have been paid.

76.    I believe that the continuance of the WC Policy is appropriate in the ordinary course of business.

77.     I believe that all of the Wages relating to the period prior to the Petition Date (to the extent not already paid) would constitute priority claims under sections 507(a)(4) of the Bankruptcy Code.

78.     Many Employees may live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses.  These Employees may be exposed to significant financial and healthcare related problems if the Debtor is not permitted to pay and/or honor the Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtor's business.  Moreover, I believe that if the Debtor is unable to honor accrued Wages and the Benefits described above, including honoring prepetition PTO by allowing Employees to use accrued prepetition PTO on a postpetition basis, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.  I believe that any uncertainty with regard to continuation of Wages and Benefits will cause significant anxiety at precisely the time the Debtor needs its Employees to perform their jobs at peak efficiency.

79.     Additionally, to the best of my knowledge, the Deductions (including, for example, any 401(k) Plan contributions held by the Debtor) do not constitute property of the Debtor's estate and principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntary Deductions), and judicial authorities (in the case of involuntary Deductions), have designated for deduction from Employee paychecks.  The failure to transfer these withheld funds could result in hardship to certain Employees.  Moreover, if the Debtor cannot remit these amounts, the Employees may face legal action due to the Debtor's failure to submit these payments.

80.    Finally, the Employees have an intimate knowledge of the operation of the Debtor's business and are critical components to the successful sale of the Debtor's business. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtor and its ability to maximize the value of its assets. I believe that satisfaction of the Wages and Benefits, as described herein and in the Employee Wage and Benefits Motion, is necessary to maintain the Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

E.    **Application for an Order Appointment Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and LBR 2002-1(f)**

81.    The Debtor requests authority to retain Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent for the Debtor on the terms set forth in the Engagement Agreement attached as Exhibit A to the Application.

82.    The Debtor has obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, I believe that, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.

83.    Although the Debtor has not yet filed its schedules of assets and liabilities, it is anticipated that there will be in excess of 2,500 entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtor's businesses, I believe that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtor's estate and its creditors.

F.      **Motion Pursuant to Sections 105(a), 507(a)(8), and 541(d) of the Bankruptcy Code for an Order Authorizing the Payment of Prepetition Sales, Use and Franchise Taxes and Similar Taxes and Fees**

84.     In the ordinary course of business, the Debtor collects and pays taxes, including, but not limited to, sales and use taxes, franchise taxes, and certain other business license fees, to various taxing authorities in multiple jurisdictions (the "Taxing Authorities"), as described below.

*Sales and Use Taxes*

85.     The Debtor collects and remits sales, use and related taxes ("Sales and Use Taxes") to the Taxing Authorities in nine states and/or certain municipal or governmental subdivisions or agencies of those states in connection with the sale of their products in those states.  Generally, the Debtor collects and remits Sales and Use Taxes to the applicable Taxing Authority on a monthly basis, however some jurisdictions are due semi-annually or annually.  I believe that, as of the Petition Date, the Debtor currently owes approximately $10,500 in unremitted Sales and Use Taxes.

*Franchise Taxes*

86.     The Debtor is required to pay franchise taxes (the "Franchise Taxes") to certain Taxing Authorities to operate their businesses in the applicable taxing jurisdiction. Certain states may refuse to qualify a debtor to do business in a state or recognize a name change, merger or other activity if franchise taxes have not been paid.  Most jurisdictions assess franchise taxes on an annual basis, in arrears.  I believe that, as of the Petition Date, the Debtor currently owes approximately $15,000 in unremitted Franchise Taxes.

87.    Any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's sale efforts.  Specifically, the Debtor's failure to remit the Prepetition Tax Obligations could adversely affect the Debtor's remaining business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtor or prevent the Debtor from continuing its business and administering its estate, which, even if unsuccessful, would unnecessarily divert the Debtor's attention from the process of maximizing the value of its estate; (b) the Taxing Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate; (c) some of the Taxing Authorities may seek to collect penalties, cancel franchises or other licenses, or undertake other unfavorable enforcement actions if the Debtor does not pay the Franchise Taxes; and (d) certain directors, officers and employees might be subject to personal liability -- even if such a failure to remit such Prepetition Tax Obligations was not a result of malfeasance on their part -- which would undoubtedly distract these key employees from their duties related to the Debtor's restructuring.

88.    I believe that payment of the Prepetition Tax Obligations is an exercise of sound business judgment and is necessary to maximize the value of the Debtor's estate for the benefit of its creditors.  If the Debtor does not continue paying the Prepetition Tax Obligations when they come due on a timely basis, it is very possible that Taxing Authorities or those parties who ordinarily collect the Prepetition Tax Obligations may seek to interfere with the Debtor's businesses and the efficient administration of the estate.

89.    Specifically, if the Prepetition Tax Obligations are not paid, the Debtor will be at risk for the business disruptions that would result from, among other things, (i) any

liability of the directors and officers for failures to remit the "trust fund" Taxes, (ii) the administrative disruption of unnecessary local audits, and (iii) any operational disruptions or challenges to the Debtor's right to operate within certain jurisdictions where the Prepetition Tax Obligations were not paid.  Addressing any potential subsequent action taken by those Taxing Authorities or those parties who ordinarily collect the Prepetition Tax Obligations would be costly, would place an administrative burden on management, and divert management's attention from the reorganization process.

90.    The Debtor intends to pay all tax and regulatory obligations in a timely manner, in accordance with its ordinary business practice, and as authorized by the Order approving this Motion.  Moreover, the Debtor has made or will make arrangements to readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Prepetition Tax Obligations.

For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

I declare under penalty of perjury under the United States of America that the foregoing is true and correct.

Executed this 8th day of March, 2017 at Pittsburgh, Pennsylvania.

_____

SUZANNE ROSKI