# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AQUION ENERGY, INC., [1] | ) | Case No. 17-10500 (KJC) |
| | ) | |
| Debtor. | ) | |

**MOTION FOR ENTRY OF AN ORDER (I) (A) AUTHORIZING
ENTRY INTO THE ASSET PURCHASE AGREEMENT WITH RESPECT
TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS,
(B) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL
OF THE ASSETS OF DEBTOR, (C) SCHEDULING AN AUCTION AND HEARING TO
CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF NOTICES
RELATED THERETO, (D) ESTABLISHING PROCEDURES RELATING TO THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES,
INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (E) APPROVING
CERTAIN BREAKUP FEE PROVISIONS; (II) AUTHORIZING AND APPROVING
(A) THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS AND (B) THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN CONTRACTS AND LEASES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor" or

"Aquion") files this motion (the "Motion") for the entry of an order pursuant to sections 105(a),

363, 365 and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002,

6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for: (i) an

order substantially in the proposed form attached hereto as **Exhibit A** (the "Bid Procedures

Order"): (a) approving certain sale and bid procedures attached as Exhibit 1 to the Bid

---

[1] The Debtor in this chapter 11 case and the last four digits of the Debtor's U.S. tax identification number is Aquion Energy, Inc. (1370). The Debtor's headquarters is located at 32 39th Street, Pittsburgh, PA, 15201.

Procedures Order (the "Bid Procedures") in connection with the sale (the "Sale") of the Debtor's

right, title and interest in substantially all of the assets and properties used in the connection with

the operation of the Debtor's business, as set forth in the Purchase Agreement (defined below);

(b) scheduling both the auction and hearing to consider approval of such Sale; (c) approving

procedures related to the assumption and assignment of certain executory contracts and

unexpired leases related to the Sale; (d) approving the form and manner of the notices of the Bid

Procedures attached as **Exhibits 2**, **3** and **4** of the Bid Procedures Order; and (e) approving the

proposed breakup fee in favor of the Stalking Horse Purchaser (defined below); and (ii) an order,

substantially in the proposed form attached hereto as **Exhibit B** (the "Sale Order") (a) approving

the Debtor's entry into that certain *Asset Purchase Agreement* dated as of May 23, 2017,

attached as **Exhibit C** hereto, without schedules, (the "Purchase Agreement"), by and among the

Debtor and Bluesky Energy US, Inc. (by and though its parent BlueSky Energy Entwicklungs-

und Produktions GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*)

under the laws of Austria) (or its assignees and assigns to the extent permitted under the

Purchase Agreement, the "Stalking Horse Purchaser"); (b) authorizing the Sale of such assets

free and clear of liens, claims, encumbrances, and other interests, except as provided in the

Purchase Agreement and (b) approving the assumption and assignment of certain of the Debtor's

executory contracts and unexpired leases related to the Sale; and (iii) granting relief related. In

support of this Motion, the Debtor respectfully states the following:

2

## Jurisdiction and Venue

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006 and 9014 and Local Rules 2002-1(b), 6004-1 and 9006-1.

## Background

4.    On March 8, 2017 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its properties as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On March 31, 2017, the Office of the United States Trustee appointed a committee of unsecured creditors (the "Committee") in this case.

5.    The factual background regarding the Debtor, including its current and historical business operations and the events precipitating the chapter 11 filing, is set forth in detail in the *Declaration of Suzanne Roski, Chief Restructuring Officer, in Support of First Day Motions* (the "First Day Declaration") fully incorporated herein by reference.[2]

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration.

DOCS_DE:212988.20 05436/001

### Debtor's Operations and the Assets to Be Sold

6.     The Debtor manufactures saltwater batteries with a proprietary, environmentally-friendly electrochemical design.  Based in Pittsburgh, the Debtor was founded in 2008 and had its first commercial product launch in 2014.  Designed for stationary energy storage in pristine environments, island locations, homes, and businesses, the Debtor's batteries have been Cradle to Cradle Certified™, an environmental sustainability certification that has never previously been given to a battery producer.  The Debtor's battery technology has won multiple prestigious awards including *Popular Science Best of What's New Innovation of the Year* (2014), *MIT Technology Review 50 Smartest Companies* (2015), *Global Cleantech 100 North American Company of the Year* (2017), among others.  The Debtor's batteries contain no heavy metals or toxic chemicals and are non-flammable and non-explosive.  The Debtor's products include battery stacks, modules and monitoring systems.  More than 55 global dealers and distributors sell the Debtor's products directly to end users and other customers that incorporate the batteries into third party systems and equipment such as inverters, controls, solar/wind generators, gensets, racking, and enclosures.

7.     The Debtor seeks to sell its manufacturing operations, and substantially all of their other business assets and property associated with its battery technology (the "Assets").

### Financing and Liens Affecting the Assets

8.     In May 2014, the Debtor entered into a secured loan agreement with Trinity Capital Fund II, L.P. as lender or any successor or assignee thereof in such capacity ("Trinity") to provide term loans totaling up to $20.0 million.  The obligations that certain

4

*Master Loan and Security Agreement*, dated as of May 1, 2014, as amended, supplemented or otherwise modified from time to time prior to the date hereof (the "Trinity Loan Agreement"), mature on the last day of the forty-second (42nd) month following the date of the initial term note.

9. All of the obligations owing to Trinity under the Trinity Loan Agreement are asserted to be secured by liens (the "Prepetition Liens") on substantially all of the Debtor's assets (the "Prepetition Collateral"), including cash collateral as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"). The Prepetition Liens are subject to certain "Permitted Liens" (as defined in the Trinity Loan Agreement), which include, among other items: (a) purchase money security interests or liens in connection with operating or capital leases for equipment and loans for equipment not exceeding $12,000,000 in principal amount outstanding at any time; (b) liens on accounts receivables or inventory securing working capital debt facilities not to exceed $5,000,000 in principal amount outstanding at any time; and (c) liens securing certain permitted scheduled debt.

10. As of the Petition Date, the Debtor's obligations under the Trinity Loan Agreement totaled no more than $4,409,538 in principal obligations, plus an "End of Term Payment" (as defined in the Trinity Loan Agreement), in the amount of $750,000 or 5% of the original balance of term notes (total advances were originally $15.0 million).

11. Pursuant to the *Interim Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 33] (the "Interim Cash Collateral Order") entered by the Bankruptcy

5

Court on March 10, 2017, Trinity is provided a continuing security interest in and lien on all

collateral of the Debtor of the same type and nature that exists as of the Petition Date with the

same validity (or invalidity) and priority as exists as of the Petition Date, including the proceeds

thereof (the "Replacement Lien") and, solely to the extent of any diminution in value of its

collateral, an additional and replacement security interest in and lien on all property and assets of

the Debtor's estate. *See* Interim Cash Collateral Order, ¶ 7(i) and (ii).  Certain creditors have

also asserted liens on certain of the Debtor's equipment and as set forth below will be provided

notice of this Motion and related relief sought herein.

### The Marketing Process

12.     In October 2016, the Debtor engaged Citi Global Markets, Inc. ("Citi") as

investment bankers to undertake a marketing process for the Debtor, its assets or to raise

additional capital.  During Citi's engagement, the Debtor attracted several interested parties, but

Citi was unsuccessful in attracting a buyer or obtaining a capital raise.  The Debtor's

management, however, continued its marketing efforts through and subsequent to the Petition

Date, as detailed below.

13.     Shortly after filing its chapter 11 petition, the Debtor reached out to

twenty-two parties Citi had contacted during the earlier marketing process.  The Debtor

provided, via electronic mail, notification that it had filed its chapter 11 petition, a "teaser"

document with key details about the Debtor, and a nondisclosure agreement ("NDA").  None of

those parties had participated in the Debtor's sale process to date.  The Debtor also contacted, on

an individual basis, approximately six other parties it assessed as likely to participate in a

6

potential sale effectuated under section 363 of the Bankruptcy Code. These six parties generally

had not been interested in purchasing the Debtor's assets outside of chapter 11 and included one

existing Aquion investor that had already performed diligence on the Debtor and five large U.S.

based and international firms. Two of these parties are still engaged in the sale process.

14.     Beginning on the Petition Date, additional parties began contacting the

Debtor expressing interest in acquiring all or substantially all of the Debtor's assets. To date,

thirty-nine such parties have made expressions of interest with thirty-three executing the

Debtor's NDA. Interested parties include certain of Aquion's distributors or licensed resellers,

battery manufacturers, energy/petrochemical companies, private equity firms, renewable energy

companies, and other parties in interest. There is wide geographic dispersion among interested

parties with more parties based outside than within the United States and includes parties in Asia

and the South Pacific, Australia, and Eastern and Western Europe.

15.     In addition, the Debtor vetted with the Committee the list of parties it had

approached or that had expressed an interest in acquiring the Debtor's assets. The Committee

did not have any additional names to provide.

16.     The Debtor established, and continues to update, an electronic data room

to facilitate the diligence efforts of interested parties. Approximately fifty users have accessed

the Debtor's electronic data room. Data room users have initiated nearly 11,000 file views. In

addition to making information available in the data room, the Debtor has engaged in written and

in-person discussions to address diligence requests and questions. As of the date of this Motion,

nine parties have made site visits to the Debtor's facilities. Additionally, the Debtor has engaged

7

in multiple telephonic information sessions to advance those parties' diligence efforts. Finally, the Debtor continues to engage in regular contact with interested parties to address potential buyer's diligence requests and to apprise interested parties of the status of the sale process.

### The Purchase Agreement[3]

17.     In April 2017, the Stalking Horse Purchaser submitted a letter of intent to buy the Debtor's business. Shortly thereafter, the Debtor negotiated and, at arms' length, entered into the Purchase Agreement with the Stalking Horse Purchaser, pursuant to which it will acquire the Assets on the terms and conditions specified in the Purchase Agreement. In connection with the Purchase Agreement, the Stalking Horse Purchaser has submitted a deposit in the amount of $280,000, which deposit shall be nonrefundable upon termination of the Purchase Agreement by reason of the Stalking Horse Purchaser's default of its material obligations under the Purchase Agreement and, conversely, refundable as provided for in the Purchase Agreement. A Word version of the Purchase Agreement will be placed in the data room set up by the Debtor for prospective bidders no later than two (2) days before the hearing to consider entry of the Bid Procedures Order (the "Bid Procedures Hearing").[4] The sale transaction pursuant to the Purchase Agreement is subject to competitive bidding as set forth herein and in the Bid Procedures, and the Bid Procedures Order.

---

[3] The foregoing is only a summary of certain of the terms and provisions of the Purchase Agreement. In the event of any conflict between the summary set forth in this Motion and the Purchase Agreement, the Purchase Agreement controls.

[4] Concurrently herewith, the Debtor has filed a motion for an order shortening time with respect to the Motion to schedule the Bid Procedures Hearing for June 6, 2017.

18.    Pursuant to the terms of the Purchase Agreement, the Stalking Horse Purchaser has agreed to purchase the Assets for $2,800,000, in addition to the assumption of certain liabilities set forth in the Purchase Agreement and subject to certain adjustments (the "Purchase Price"). The Stalking Horse Purchaser entered into the Purchase Agreement in contemplation of the Court's approval of a breakup fee in the amount of $126,000 (the "Breakup Fee") to compensate the Stalking Horse Purchaser for its time and effort in examining the Debtor's business, conducting due diligence, and the loss of opportunity that such time and effort has caused should another bidder be the Successful Bidder (as defined below) rather than the Stalking Horse Purchaser. The Breakup Fee represents the Stalking Horse Purchaser's sole compensation in such event. The Debtor, in the exercise of its business judgment and in return for the value provided by the Stalking Horse Purchaser's offer, especially given the time exigencies underlying this transaction, believes that the Breakup Fee is a necessary inducement for the stalking horse bid, and thus, necessary to establish a "floor" for the sale of the Assets and ultimately encourage competitive bidding and promote the realization of the highest value for the Assets.

19.    The Debtor believes that the Bid Procedures proposed hereby will enable the efficient consummation of the sale of the Assets at an auction to the highest or best bidder. The Debtor will continue to market the Assets pending the outcome of the auction. In light of the extensive marketing process already undertaken and described above, as well as the additional efforts that will be made during the proposed sale process, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a Sale of the Assets.

20.    The Debtor believes that such marketing of the Assets over the period contemplated by the Bid Procedures, in addition to the marketing activities that have taken place to date, will result in the highest or best price for the Assets and maximize value for all of the Debtor's constituents.

### Relief Requested[5]

21.    Pursuant to this Motion, the Debtor requests that the Court enter the proposed Bid Procedures Order:

(a)    approving the proposed Bid Procedures annexed as **Exhibit 1** to the proposed Bid Procedures Order, including the overbid provisions, Breakup Fee provisions, and granting the Debtor authority to designate Bluesky Energy US, Inc. as the Stalking Horse Purchaser, subject to the terms of the Purchase Agreement and Bid Procedures Order;

(b)    approving the procedures set forth herein (the "Cure Procedures") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Assumed Executory Contracts");

(c)    establishing a date for holding the auction (the "Auction") to occur one day prior to Sale Hearing and approving certain procedures in connection therewith;

(d)    scheduling the hearing (the "Sale Hearing") to approve any sale transaction(s) to either the Stalking Horse or the highest or best bidder for the Assets determined

---

[5] In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as currently set forth in the Stalking Horse APA have been summarized and are attached hereto as **Exhibit D**.

at the Auction (the "Successful Bidder") and establishing deadlines for objections and responses

to the relief requested in the Motion with respect to the proposed Sale and Sale Hearing; and

    (e)    approving the form and manner of notice to be served upon certain

parties, including: (i) the form of notice, substantially in the form attached to the Bid Procedures

Order as Exhibit 2 (the "Sale and Bid Procedures Notice"), to be served on the Bid Procedures

Notice Parties (as defined below); (ii) the form of notice, substantially in the form attached the

Bid Procedures Order as Exhibit 3, to be served on all known creditors of the Debtor (the

"Creditor Notice"); and (iii) the form of notice to parties holding Assumed Executory Contracts

in conjunction with the proposed sale, in substantially the form attached the Bid Procedures

Order as Exhibit 4 (the "Cure Notice").

    22.    The Debtor further requests that the Court enter the Sale Order:

    (a)    approving the Sale of the Assets to the Stalking Horse Purchaser or

other Successful Bidder, free and clear of all liens, claims, encumbrances, and other interests,

except as provided in the Purchase Agreement or competing purchase agreement (with all liens,

claims, encumbrances and other interests to attach to the Sale proceeds with the same validity

and in the same order of priority as they attached to the Assets prior to the Sale);

    (b)    authorizing the assumption and assignment to the Stalking Horse

Purchaser or other Successful Bidder of the Assumed Executory Contracts; and

    (c)    authorizing the Debtor to consummate the Sale and all documents,

agreements, and contracts executed in conjunction therewith.

## Proposed Bid Procedures[6]

23.    The Bid Procedures are summarized as follows:

*Agreement*

24.    Prospective bidders should submit a proposed asset purchase agreement (a " Competing Agreement"), similar in form and substance, as modified, to the Purchase Agreement. Subject to the approval of the Court, the highest or best bidder at the auction will purchase the Assets, and assume certain executory contracts and unexpired leases, free and clear of any liens, claims or encumbrances. The transaction contemplated is subject to competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to Bankruptcy Code sections 363 and 365.

*Assets for Sale*

25.    The Debtor is offering for sale the Assets, which generally consist of the manufacturing operations, substantially all of the Debtor's other business assets and property associated with its battery technology. Except as otherwise provided in the Purchase Agreement, all of the Debtor's right, title and interest in and to the Assets subject thereto shall be sold free and clear of any Liens, Claims, interests and encumbrances (other than Permitted Liens and/or except as otherwise provided in the Competing Agreement) (collectively, the "Liens, Claims and Encumbrances") to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Liens, Claims and Encumbrances to attach to the net proceeds of the sale of the Assets with

---

[6] The foregoing is a summary of the Bid Procedures. In the event of any conflict between the procedures summarized in this Motion below and the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order, the latter shall control. Unless otherwise noted, capitalized terms used in this section describing the proposed Bid Procedures have the meanings ascribed in the Purchase Agreement.

the same validity and priority as such Liens, Claims and Encumbrances applied against the

Assets.

***Participation Requirements***

      26.    In order to participate in the bidding process and to or otherwise be

considered for any purpose hereunder, a person interested in all or portions of the Assets (a

"Potential Bidder") must first deliver (unless previously delivered) to the Debtor and its counsel,

not later than five (5) business days before the Bid Deadline (defined below), unless otherwise

waived by the Debtor in its sole discretion in consultation with the Official Committee of

Unsecured Creditors (the "Committee"), the following:

      (a)    Confidentiality Agreement.  An executed confidentiality agreement ("Confidentiality Agreement") in form and substance acceptable to the Debtor;

      (b)    Identification of Potential Bidder.  Concurrently with its Bid, identification of the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

      (c)    Corporate Authority.  Concurrently with its Bid, written evidence satisfactory to Debtor of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction;

      (d)    Disclosure.  Written disclosure of any connections or agreements with the Debtor, the Stalking Horse Purchaser, any other known Potential Bidder or Qualified Bidder (as defined below), and/or any officer, director or direct or indirect equity security holder of the Debtor; and

      (e)    Proof of Financial Ability to Perform.  Prior to or at the time of presentation of a Bid, written evidence that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction.  Such information should include, *inter alia*, the following:

(1)    the Potential Bidder's current financial statements (audited if they exist);

(2)    contact names and numbers for verification of financing sources;

(3)    evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

(4)    any such other form of financial disclosure of credit-quality support information or enhancement acceptable to the Debtor demonstrating that such Potential Bidder has the ability to close the contemplated transaction.

**Designation as Qualified Bidder**

27.    A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the Assets of the Debtor do not overlap and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described above and otherwise satisfies the requirements of the Bid Procedures Order and the procedures set forth herein, and that the Debtor, in its discretion (in consultation with the Committee), determines is reasonably likely to submit a *bona fide* offer for the Assets and to be able to consummate a sale if selected as a Successful Bidder.

28.    The Debtor, in its sole discretion and in consultation with the Committee, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

29.    The Stalking Horse Purchaser is a Qualified Bidder and is deemed to satisfy all Bid requirements as set forth below.

14

*Access to Due Diligence Materials*

30.    Only Potential Bidders that execute and deliver a confidentiality

agreement satisfactory to the Debtor, in its sole discretion, are eligible to receive due diligence

access or additional non-public information.  The Debtor shall not be required to provide

confidential or proprietary information to a Potential Bidder if the Debtor believes that such

disclosure would be detrimental to the interests of the Debtor.  If the Debtor determines that a

Potential Bidder that has satisfied the Participation Requirements does not constitute a Qualified

Bidder, then such Potential Bidder's right to receive due diligence access or additional non-

public information shall terminate.  The Debtor will designate an employee or other

representative to coordinate all reasonable requests for additional information and due diligence

access from such Qualified Bidders.  The Debtor shall not be obligated to furnish any due

diligence information after the Bid Deadline.  The Debtor is not responsible for, and will bear no

liability with respect to, any information obtained by Qualified Bidders in connection with the

sale of the Assets.

*Due Diligence From Bidders*

31.    Each Potential Bidder and Qualified Bidder (each, a "Bidder") (and,

collectively, "Bidders") shall comply with all requests for additional information and due

diligence access by the Debtor or its advisors regarding such Bidder and its contemplated

transaction.  Failure by a Potential Bidder to comply with requests for additional information and

due diligence access will be a basis for the Debtor to determine that the Potential Bidder is not a

Qualified Bidder.  Failure by a Qualified Bidder to comply with such requests for additional

15

information and due diligence access will be a basis for the Debtor to determine that a bid made

by a Qualified Bidder is not a Qualified Bid.

### Bidding Process

32.    The Debtor and its advisors, shall (in consultation with Committee): (i)

determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders

in conducting their due diligence investigations, as permitted by the provisions hereof;

(iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the

Assets.  The Debtor (in consultation with the Committee) shall have the right to adopt such other

rules for the bidding process that are not inconsistent with the Bid Procedures Order that will

better promote the goals of such process.

*Bid Deadline*

33.    On or before the Bid Deadline, a Qualified Bidder that desires to make an

offer, solicitation or proposal (a "Bid") shall deliver written and electronic copies of its Bid to

the Debtor, Aquion Energy, Inc., 32 39th Street, Pittsburgh, PA, 15201, Attn:  Suzanne B. Roski,

and Suzanne.roski@aquion-energy.com, with a copy to counsel for the Debtor, Pachulski Stang

Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, Delaware 19801, Attn: Laura

Davis Jones, not later than 4:00 p.m. (prevailing Eastern time), which the Debtor proposes to be

June 16, 2017 by noon prevailing Eastern Time (the "Bid Deadline").  The Debtor shall promptly

provide copies of all Bids to counsel for the Committee.

34.    A Bid received after the Bid Deadline shall not constitute a Qualified Bid, unless otherwise allowed by the Debtor in its sole discretion (in consultation with the Committee).

***Bid Requirements***

35.    To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtor (in consultation with the Committee) to satisfy each of the following conditions unless waived or modified by the Debtor in its sole discretion (in consultation with the Committee):

(1)    Good Faith Deposit.  Each Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of the Debtor in an amount to be determined by the Debtor, but in any event no less than 10% of the Bidder's offer.  The Debtor reserves the right to modify the amount of the Good Faith Deposit in its discretion (in consultation with the Committee).

(2)    Minimum Bid.  The consideration proposed by the Bid may include only cash and/or other consideration acceptable to the Debtor (in consultation with the Committee) in an amount of (1) no less than $3,026,000, which is the sum of: (a) the purchase price offered by the Stalking Horse Purchaser in the amount of $2,800,000; (b) $100,000 in cash as an initial overbid amount; and (c) $126,000, which is the dollar value of the Breakup Fee (as defined below), if any, in cash; and (2) the assumption of either all Assumed Liabilities that would be assumed by the Stalking Horse Purchaser under the Purchase Agreement or additional cash or other consideration of an equivalent value as determined by the Debtor in its business judgment.  The amounts in (1)-(2) of this paragraph is referred to as a "Minimum Bid."

(3)    Irrevocable.  The Bids of the Successful Bidder and the Back-up Bidder (defined below) must be irrevocable until the earlier of (a) the closing of the transaction with the Successful Bidder, or (b) the date the Sale Order has become final and non-appealable (the earliest of these dates being "Termination Date").

17

(4)    <u>Principal Terms</u>.  A Bid must include an executed agreement pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "<u>Contemplated Transaction Documents</u>") and a black-lined copy of the Competing Agreement marked to show all changes requested by the Qualified Bidder, including specification of the proposed purchase price and any changes to any exhibits or schedules to the Competing Agreement.  The terms and conditions of the Contemplated Transaction Documents must be, in the aggregate, not materially more burdensome to Debtor that the provisions contained in the Stalking Horse Purchase Agreement.  A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Contemplated Transaction Documents.  The Contemplated Transaction Documents must include a commitment to close by no later than the closing date set forth in section 2 of the Purchase Agreement.  A Bid should propose a contemplated transaction involving all or substantially all of the Assets, <u>provided, however</u>, that the Debtor in its sole discretion (in consultation with the Committee) may consider proposals for less than substantially all the Assets if such proposals or combination of proposals maximizes the value of the Debtor's estate.

(5)    <u>Contingencies</u>.  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties at or before closing or the satisfaction in all material respects at the closing of specified conditions.  A Bid must disclose any governmental approvals identified by the Qualified Bidder other than as set forth in the Competing Agreement that may impact the evaluation of such Bid.

(6)    <u>Authorization to Bid and Identity of Bidder</u>.  A Bid must include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery and closing of the Contemplated Transaction Documents.  A Bid must also fully disclose the identity of such entity that is submitting the Bid, including the identity of each equity holder or other financial backer of the bidder if such bidder is formed for the purpose of submitting the bid.

(7)    <u>Financing Sources</u>.  A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtor (in consultation with the Committee) with appropriate contact information for such financing sources.

(8)    <u>No Fees Payable to Qualified Bidder</u>.  A Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures.

(9)    <u>Immediate Payment of the Breakup Fee</u>.  A Bid must allow for the immediate payment of the Breakup Fee to the Stalking Horse Purchaser from the first proceeds of the cash portion of the purchase price of such Bid.

(10)    <u>Non-Reliance</u>.  A Bid must include an acknowledgement and representation of the Qualified Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets and Assumed Liabilities prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

36.    A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements and that satisfies the Bid Deadline requirement above shall constitute a "Qualified Bid," if the Debtor believes, in its sole discretion (in consultation with the Committee), that such Bid would be consummated if selected as the Successful Bid.  The Debtor shall have the right to reject any and all bids that they believe, in its sole discretion (in consultation with the Committee), do not comply with the Bid Procedures.  In the event that any Potential Bidder is determined by the Debtor not to be a Qualified Bidder, the Potential Bidder shall be refunded its Good Faith Deposit.

**_Breakup Fee_**

37.    Recognizing the Stalking Horse Purchaser's expenditure of time, energy

19

and resources, and that the Stalking Horse Purchaser provides a floor bid with respect to the Assets that it offers to purchase, the Debtor is authorized (pursuant to the Bid Procedures Order) to provide the following bidding protections to the Stalking Horse Purchaser.

(a)    The Debtor has agreed to pay the Stalking Horse Purchaser a Breakup Fee in an amount equal to $126,000 as a breakup fee pursuant to an in accordance with terms of the Purchase Agreement and Bid Procedures Order.

(b)    Any Bid submitted on the Bid Deadline by a party or parties other than the Stalking Horse Purchaser must be in an amount that is sufficient to pay the Breakup Fee and result in additional consideration to the Debtor's estate in the amount of at least $100,000 (as compared to the Purchase Price offered by such Stalking Horse Purchaser), after payment of the Breakup Fee.

### Auction

38.    If the Debtor receives at least one (1) Qualified Bid from a Qualified Bidder other than the Stalking Horse Purchaser prior to the Bid Deadline (unless such deadline is extended, as provided below), then the Debtor shall notify the Stalking Horse Purchaser and each other Qualified Bidder that the Debtor intends to conduct an auction (the "Auction") to consider all Qualified Bids and to determine the highest or otherwise best bid with respect to the Assets. The Debtor shall provide the Stalking Horse Purchaser, all Qualified Bidders and the Committee with copies of all Qualified Bids in advance of the Auction, but may exclude any confidential financial information, as reasonably designated by the applicable Qualified Bidder.  Unless otherwise designated by the Debtor, the Debtor requests that the Auction commence one business day prior to the Sale Hearing at 10:00 a.m (prevailing Eastern Time) at the offices of Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, DE 19899.

39.    In advance of the Auction, the Debtor will notify all Qualified Bidders in

20

writing of (i) the highest or otherwise best Qualified Bid, as determined by the Debtor in its discretion (the "Baseline Bid") and (ii) the time and place of the Auction.

40.    If the Debtor does not receive at least one (1) Qualified Bid from a Qualified Bidder other than the Stalking Horse Purchaser, then no Auction shall be scheduled or conducted, and the Court at the Sale Hearing shall proceed to solely consider the approval of the proposed sale to the Stalking Horse Purchaser as set forth in the Purchase Agreement and shall not consider any competing or alternative offers or proposals to purchase the Assets.

41.    If the Auction is necessary, such Auction shall be conducted according to the following procedures:

(a)    **Participation at the Auction**

42.    Only the Stalking Horse Purchaser and Qualified Bidders that have submitted Qualified Bids are eligible to participate at the Auction. Only the authorized representatives and professional advisors of each of the Qualified Bidders, the Debtor, the Committee, and the U.S. Trustee shall be permitted to attend the Auction.

43.    Except as otherwise set forth herein, the Debtor (in consultation with the Committee) may conduct the Auction in the manner it determines will result in the highest or best offer for the Assets.

44.    In the Debtor's sole discretion, after the conclusion of the Auction, the Debtor may resume an auction for the sale of discrete assets and/or discrete groups of assets, if any, which are not included in the Successful Bid, on such bidding procedures as may be implemented by the Debtor in its discretion.

**(b)      The Debtor Shall Conduct the Auction**

45.      The Debtor and its professionals shall direct and preside over the Auction. At the start of the Auction, the Debtor shall describe the terms of the Baseline Bid. The determination of which Qualified Bid constitutes the Baseline Bid shall be made by the Debtor in its discretion (in consultation with the Committee), and may take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the estate (the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtor reserves the right to conduct the Auction in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received. The Debtor shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid. Pursuant to Local Rule 6004-1, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the Bid Procedures, the Auction or the proposed transaction.

**(c)      Terms of Overbids**

46.      An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

**(d)      Minimum Overbid Increment**

47.      During the Auction, bidding shall begin initially with the Baseline Bid. Any Overbid after the Baseline Bid shall be made in increments of at least $50,000 in cash or

22

other consideration acceptable to the Debtor; *provided, however*, that any overbids by the Stalking Horse Purchaser thereafter shall only be required to be equal to the sum of (1) the then existing lead Bid plus (2) the $50,000 Overbid less (3) $126,000 (i.e. the amount of the Breakup Fee).

48.    Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtor (in consultation with the Committee) accepts a higher Qualified Bid as an Overbid.

### (e)    Consideration of Overbids

49.    The Debtor reserves the right, in its reasonable business judgment, to make one or more adjournments in the Auction to, among other things:  facilitate discussions between the Debtor and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

### (f)    Additional Procedures

50.    The Debtor may adopt rules for the Auction at or prior to the Auction that, in its reasonable discretion (in consultation with the Committee), will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order or the Bankruptcy Code.  All such rules will provide that all Bids shall be made and received in

23

one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

51.     The Debtor (in consultation with the Committee) may (a) determine which Qualified Bid, if any, is the highest and best offer and (b) reject at any time before entry of an order of the Bankruptcy Court approving the sale of the Assets pursuant to a Qualified Bid, any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code or these Bid Procedures; or (iii) contrary to the best interest of the Debtor, its estate and its creditors.

52.     The Debtor may, in its sole discretion (in consultation with the Committee), extend the Bid Deadline or the Auction Date, as determined, beyond the dates provided herein.  In the event of such an extension, the Debtor shall provide notice to the Notice Parties and any Qualified Bidders of such extension, any related time and location details with respect to same, and any consequent continuance of the Sale Hearing.

(g)     **Consent to Jurisdiction as Condition to Bidding**

53.     All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of each Qualified Bidder's Contemplated Transaction Documents, as applicable.

24

(h)    **Closing the Auction**

54.    Upon conclusion of the bidding, the Auction shall be closed, and the Debtor (in consultation with the Committee) shall immediately identify the highest or best offer for the Assets (which may be an aggregate of bids for less than all of the Assets) (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest or best offer will provide the greatest amount of net value to the Debtor, and the next highest or best offers after the Successful Bid (the "Back-up Bid") and the entity or entities submitting the Back-up Bid (the "Back-up Bidder"), and advise the Qualified Bidders of such determination. Upon three (3) days' prior notice by the Debtor, the Back-up Bidder selected by the Debtor must immediately proceed with the closing of the transaction contemplated under the Back-up Bid in the event that the transaction with the Successful Bidder is not consummated for any reason.

55.    As stated above, The Bids of the Successful Bidder and the Back-up Bidder must be irrevocable until the Termination Date.

**Acceptance of Successful Bid**

56.    The Debtor shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtor's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of such Qualified Bid. The Debtor will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

## "As Is, Where Is"

57.    The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents or its estate except to the extent set forth in the Competing Agreement of the Successful Bidder.  Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or the Competing Agreement of the Successful Bidder.

## Free of Any and All Interests

58.    Except as otherwise provided in the Successful Bidder's Competing Agreement and subject to the approval of the Bankruptcy Court, all of Debtor's right, title and interest in and to the Assets subject thereto shall be sold free and clear of any Liens, Claims, and Encumbrances to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Liens, Claims and Encumbrances to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Liens, Claims and Encumbrances applied against the Assets.

**Sale Hearing**

59.    The Debtor has requested that the Sale Hearing occur on June 21, 2017 at 2:00 (prevailing Eastern time), or on such other date as may be established by the Bankruptcy Court.

60.    If the Successful Bidder fails to consummate an approved sale in accordance with the applicable asset purchase agreement or such agreement is terminated, the Debtor shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bids, and the Debtor shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting the next highest such Bid without further order of the Bankruptcy Court.

**Return of Good Faith Deposit**

61.    The Good Faith Deposit of the Successful Bidder (or the Back-up Bidder that becomes a Successful Bidder) shall be applied to the purchase price of such transaction at Closing.  The Debtor will hold the Good Faith Deposits of the Successful Bidder and the next highest Qualified Bidder in a segregated account until the closing of the sale with the Successful Bidder; good Faith Deposits of all other Qualified Bidders shall be held in a segregated account, and thereafter returned to the respective bidders following the conclusion of the Auction.  If a Successful Bidder (including any Back-up Bidder that has become the Successful Bidder) fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtor shall be entitled to retain the Successful Bidder's Good Faith

DOCS_DE:212988.20 05436/001

Deposit as part of the Debtor's damages resulting from such Successful Bidder's breach or failure to perform.

### Notice of Sale Hearing

62.     As noted above, the Debtor requests that the Court: (1) schedule the Sale Hearing for June 21, 2017, at 2:00 p.m. prevailing Eastern Time, which is a previously set omnibus hearing date and that the Court; (2) fix June 16, 2017, noon, prevailing Eastern Time as the Bid Deadline; and (2) fix June 20, 2017, at 10:00 prevailing Eastern Time for the commencement of any Auction.  The Debtor proposes that objections, if any, to the Sale be filed and properly served on the notice parties on or before June 16, 2017, by 4:00 p.m. prevailing Eastern Time.

63.     The Debtor requests that the Court approve the manner of notice of this Motion, the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Sale and Bid Procedures Notice, which the Debtor will serve on the following parties:

        (a)     the U.S. Trustee;

        (b)     counsel to the Committee;

        (c)     all parties known to assert a lien, claim or encumbrance on any of the Assets, including, but not limited to, Trinity;

        (d)     all known counterparties to the Assumed Executory Contracts;

        (e)     all entities known to have expressed an interest in bidding on the Assets;

        (f)     the United States Attorney's office;

(g)     all state attorney generals in states in which the Debtor's Assets are located;

(h)     state taxing authorities in the states in which the Debtor's assets are located; and the Internal Revenue Service;

(i)     environmental and other applicable authorities in the states or applicable jurisdictions in which the Debtor's Assets are located;

(j)     the Stalking Horse Purchaser and its counsel; and

(k)     all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bid Procedures Order (the parties listed in (a)-(k) above are collectively referred to as the "Sale and Bid Procedures Notice Parties").

64.     Additionally, the Debtor proposes to serve the Creditor Notice substantially in the form attached to the Bid Procedures Order as Exhibit 3 on all known creditors of the Debtor.

65.     The Debtor proposes to serve the Sale and Bid Procedures Notice and the Creditor Notice within two (2) business days from the date of entry of the Bid Procedures Order, by first-class mail, postage prepaid, on the appropriate parties as described above.  Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Bid Procedures Order that wishes to obtain a copy of such document may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street,

17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn: Laura

Davis Jones, Esquire), ljones@pszjlaw.com.

66.    The Debtor submits that the foregoing notices comply fully with

Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the

Bid Procedures, Auction, and Sale Hearing to the Debtor's creditors and other parties in interest

as well as to those who have expressed an interest or are likely to express an interest in bidding

on the Assets. Based on the foregoing, the Debtor respectfully requests that this Court approve

these proposed notice procedures.

### Sale Hearing

67.    At the Sale Hearing, the Debtor will seek Bankruptcy Court approval of

the sale of the Assets to the Stalking Horse Purchaser or other Successful Bidder, free and clear

of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code with all

such liens, claims and interests to attach to the proceeds of the sale, except as otherwise provided

with the same validity and in the same order of priority as they attached to the Assets prior to the

sale, including the assumption by the Debtor and assignment to the Successful Bidder of the

Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code. The Debtor will

submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the

Sale is fair, reasonable, and in the best interest of the Debtor's estate and all interested parties,

and satisfies the standards necessary to approve a sale of substantially all of a debtor's assets

articulated by the Court of Appeals for the Third Circuit in *In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).

DOCS_DE:212988.20 05436/001

### Closing

68.     The closing shall take place in accordance with terms of the Purchase Agreement or the asset purchase agreement of the Successful Bidder, approved by the Bankruptcy Court at the Sale Hearing.

### Procedures for the Assumption and Assignment of Assumed Executory Contracts

69.     As noted above, the Debtor will seek to assume and assign the Assumed Executory Contracts to be identified on schedules to the Purchase Agreement, or alternatively, identified pursuant the Successful Bidder's asset purchase agreement

70.     The Assumed Executory Contracts will be those Contracts and Leases pursuant to which the Debtor serves a Cure Notice.  However, a Successful Bidder may choose to delete certain of the Assumed Executory Contracts previously designated by the Stalking Horse Purchaser for assumption and assignment.  If the Successful Bidder chooses to delete an Assumed Executory Contract, then notice of that deletion shall be provided to the affected counterparty by Debtor.  Only those Assumed Executory Contracts assumed as of the closing of the Sale will be required to be cured.

71.     The Debtor will file with the Court and serve the form of the Cure Notice to, substantially in the form of Exhibit 4 to the Bid Procedures Order, (along with a copy of this Motion) upon each Counterparty to the Assumed Executory Contracts by no later than two business days after the entry of the Bid Procedures Order.  The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts (including the Cure Amount (defined below))

31

must be filed and served.  The Cure Notice also will identify the amounts, if any, that the Debtor

believes are owed to each Counterparty to an Assumed Executory Contract in order to cure any

defaults that exist under such contract (the "Cure Amounts").  This Motion constitutes a separate

motion to assume and assign the Assumed Executory Contracts pursuant to section 365 of the

Bankruptcy Code.

      72.    The inclusion of a contract, lease, or other agreement on the Cure Notice

shall not constitute or be deemed a determination or admission by the Debtor and its estate or

any other party in interest that such contract, lease, or other agreement is, in fact, an executory

contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights

with respect thereto are hereby reserved.

      73.    If an Assumed Executory Contract is assumed and assigned pursuant to

Court Order, then unless the applicable counterparties to the Assumed Executory Contract (each

a "Counterparty" and collectively, the "Counterparties") properly files and serves an objection to

the Cure Amount contained in the Cure Notice by the Assumption Objection Deadline (defined

below), subject to the assumption and assignment of its contract at the Closing, the Counterparty

will receive, at the time of the closing of the Sale (or as soon as reasonably practicable

thereafter), the Cure Amount as set forth in the Cure Notice, if any.  If an objection is filed by a

Counterparty to an Assumed Executory Contract, the Debtor proposes that such objection must

set forth a specific default in the executory contract or unexpired lease, claim a specific monetary

amount that differs from the Cure Amount, if any, specified by the Debtor in the Cure Notice,

along with such documentation supporting this amount, and set forth any reason why the

Counterparty believes the executory contract or unexpired lease cannot be assumed and assigned to the Successful Bidder.

74.    If any Counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (including an objection to a proposed Cure Amount) (an "Assumption Objection"), the Debtor proposes that the Counterparty must file the objection and serve it so as to be actually received on or before the Assumption Objection Deadline (defined below), upon the Debtor and the other notice parties identified in the Cure Notice by no later than (i) 4:00 p.m. (prevailing Eastern Time) on June 16, 2017; or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Auction) (the "Assumption Objection Deadline"), provided, however, as to any Successful Bidder who is not the Stalking Horse Purchaser, any Counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract. After receipt of an Assumption Objection, the Debtor will attempt to reconcile any differences in the Cure Amount or otherwise resolve the objection with the objecting Counterparty. In the event that the Debtor and the Counterparty cannot resolve an Assumption Objection, and the Court does not otherwise make a determination at the Sale Hearing regarding an Assumption Objection related to a Cure Amount, the Stalking Horse Purchaser must either (i) fund the amount in escrow or similar arrangement to pay any disputed Cure Amounts pending the resolution of any such Cure Amount disputes by the Court or mutual

33

agreement of the parties, (ii) remove the Assumed Executory Contract form assumption and assignment to it pursuant to the Purchase Agreement. Nothing herein shall modify or limit the parties' rights and obligations, if any, with respect to the conditions set forth in section 4.2.6 of the Purchase Agreement.

75.    The Successful Bidder(s) shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any Counterparty to any Assumed Executory Contracts shall not excuse the Successful Bidder(s) from performance of any and all of its obligations pursuant to the Successful Bidder's Competing Agreement. The Debtor proposes that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing if the Successful Bidder is the Stalking Horse Purchaser or, at such time as ordered by the Court if the Successful Bidder is a party other than Stalking Horse Purchaser. Disputed Cure Amounts will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court.

76.    The Debtor and the Debtor's estate shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts, pursuant to Section 365(k) of the Bankruptcy Code.

DOCS_DE:212988.20 05436/001

### Basis for Relief Requested

**A.    The Sale of the Assets is Authorized by Section 363 as a Sound Exercise of the Debtor's Business Judgment**

77.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtor has determined that the Sale of the Assets by public auction will enable them to obtain the highest and best offer for these Assets (thereby maximizing the value of the estate) and is in the best interests of the Debtor's creditors.  In particular, the Purchase Agreement is the result of comprehensive arms' length negotiations for the Sale of the Assets and the Sale pursuant to the terms of the Purchase Agreement, subject to higher or otherwise better offers at the Auction, will provide a greater recovery for the Debtor's creditors than would be provided by any other existing alternative.

78.    Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (2d Cir. 1986); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Ry. Co.*, 124 BR. 169, 176 D. Del. 1991); *see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re*

35

*Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

79.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods.*, Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.  Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

80.    Applying section 363 of the Bankruptcy Code, the proposed Sale of the Assets should be approved.  As set forth above, the Debtor has determined that the best method

36

of maximizing the recovery of the Debtor's creditors would be through the Sale of the Assets.

Further, the Debtor believes that the value its estate (and, thus, the value for the Debtor's

creditors) will receive from the Sale of the Assets exceeds any value the Debtor's estate could

obtain for the Assets if the Debtor is required to liquidate its assets piecemeal.  As assurance of

value, bids will be tested through the Auction consistent with the requirements of the Bankruptcy

Code, the Bankruptcy Rules, and pursuant to the Bid Procedures approved by the Court.

Consequently, the fairness and reasonableness of the consideration to be paid by the Successful

Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair

auction process—the best means, under the circumstances, for establishing whether a fair and

reasonable price is being paid.

**B.     The Bid Procedures Are Appropriate and
        Will Maximize the Value Received for the Assets.**

81.     As noted above, the paramount goal in any proposed sale of property of

the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly

recognize that procedures intended to enhance competitive bidding are consistent with the goal

of maximizing the value received by the estate and therefore are appropriate in the context of

bankruptcy sales. *See, e.g., In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y.

1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis

for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt

estates").

82.    Procedures to dispose of assets, similar to the proposed Bid Procedures, have been approved in other bankruptcy cases. *See, e.g., In re IMRIS, Inc.*, Case No. 15-11133 (CSS) (Bankr. D. Del. June 16, 2015); *In re Velti Inc.*, Case No. 13-12878(PJW) (Bankr. D. Del. Nov. 20, 2013); *In re Orchard Supply Hardware Stores Corp.*, Case No. 13-11565 (CSS) (Bankr. D. Del. Jul. 8, 2013); *In re Conex Holdings LLC*, Case No. 11-10501(CSS) (Bankr. D. Del. Sept. 14, 2011); *In re Barnes Bay Dev. Ltd.*, Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011); *In re East West Resort Dev. V, L.P., L.L.L.P.*, Case No. 10-10452 (BLS) (Bankr. D. Del. March 31, 2010); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); *In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006); *In re Oxford Automotive, Inc.*, Case No. 04-74377 (Bankr. E.D. Mich. Jan. 24, 2005); *see also In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 6, 2006).

83.    The Debtor believes that the Bid Procedures will establish the parameters under which the value of the Assets may be tested at an auction and through the ensuing Sale Hearing. Such procedures will increase the likelihood that the Debtor's creditors will receive the greatest possible consideration for the Debtor's Assets because they will ensure a competitive and fair bidding process. They also allow the Debtor to undertake an auction in as expeditious and efficient manner as possible, which the Debtor believes is essential to maximizing the value of the Debtor's estate for its creditors.

84.    The Debtor also believes that the proposed Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Debtor's Assets. In particular, the proposed Bid

Procedures will allow the Debtor to conduct an auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  Further, the Bid Procedures provide the Debtor with the opportunity to consider all Qualified Bids and to select, in its reasonable business judgment, and after consultation with its professionals and the Committee, the highest and best offer(s) for the Assets.

85.    In sum, the Debtor believes that the Bid Procedures will encourage bidding for the Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtor's sound business judgment.

**C.    The Sale of the Assets Free and Clear of Liens and Other Interests is Authorized by Section 363(f) of the Bankruptcy Code**

86.    The Debtor further submits that it is appropriate to sell the Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the Sale Proceeds of the Assets to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

DOCS_DE:212988.20 05436/001

87.    This provision is supplemented by Section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

88.    Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the O Assets "free and clear" of liens and interests. *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

89.    The Debtor believes that at least one of the tests of Section 363(f) is satisfied with respect to the transfer of the Assets pursuant to the Purchase Agreement. In particular, the Debtor believes that at least section 363(f)(2) will be met in connection with the transactions proposed under the Purchase Agreement because each of the parties holding liens on the Assets will consent or, absent any objection to this Motion, will be deemed to have consented to the Sale. Any lienholder also will be adequately protected by having their liens, if any, in each instance against the Debtor or its estate, attach to the Sale proceeds ultimately attributable to the Assets in which such creditor alleges an interest, in the same order of priority, with the

40

same validity, force and effect that such creditor had prior to the Sale, subject to any claims and

defenses the Debtor may possess with respect thereto.  Accordingly, Section 363(f) authorizes

the transfer and conveyance of the Debtor's Assets free and clear of any such claims, interests,

liabilities, or liens.

90.    Although Section 363(f) of the Bankruptcy Code provides for the sale of

assets "free and clear of any interests," the term "any interest" is not defined anywhere in the

Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d

Cir. 2000).  In the case of *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003),

the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit

observed that while some courts have "narrowly interpreted that phrase to mean only in rem

interests in property," the trend in modern cases is towards "a more expansive reading of

'interests in property' which 'encompasses other obligations that may flow from ownership of

the property.'"  *Id.* at 289 (citing 3 *Collier on Bankruptcy* 15th Ed. Rev., ¶ 363.06[1] (L. King,

15th rev. ed. 1988)).  As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99

F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third

Circuit in *Folger, supra*, the scope of Section 363(f) is not limited to in rem interests.  Thus, the

Third Circuit in *Folger* stated that *Leckie* held that the debtor "could sell their assets under

§ 363(f) free and clear of successor liability that otherwise would have arisen under federal

statute."  *Folger*, 209 F.3d at 258 (citing *Leckie*, 99 F.3d at 582).

91.    Courts have consistently held that a buyer of a debtor's assets pursuant to

section 363 of the Bankruptcy Code takes such assets free from successor liability resulting from

41

pre-existing claims. *See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R.

716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free

and clear of any interest that could be brought against the bankruptcy estate during the

bankruptcy); *MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837

F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale

free and clear under section 363(f) of the Bankruptcy Code); *In re New England Fish Co.*, 19

B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included

free and clear of Title VII employment discrimination and civil rights claims of debtor's

employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free

and clear of any interest permissible even though the estate had unpaid taxes); *American Living

Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986)

(product liability claims based on successor doctrine precluded after sale of assets free and

clear); *WBO P'ship v. Virginia Dept. of Medical Assistance Servs. (In re WBO P'ship)*, 189 B.R.

97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation

is an "interest" as used in section 363(f)).[7] The purpose of an order purporting to authorize the

transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter

use the transfer as a basis to assert claims against the purchaser arising from the Debtor's pre-

sale conduct. Under section 363(f) of the Bankruptcy Code, the purchaser is entitled to know

---

[7] Some courts, concluding that Section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that Section 105(a) of the Bankruptcy Code provides such authority. *See, e.g., Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

that the Debtor's assets are not infected with latent claims that will be asserted against the

purchaser after the proposed transaction is completed.  Accordingly, consistent with the above-

cited case law, the order approving the Sale should state that the Successful Bidder is not liable

as a successor under any theory of successor liability, for claims that encumber or relate to the

Assets.

**D.      The Proposed Notice of Bid Procedures, Auction, and Sale Is Appropriate**

92.      The Debtor believes that it will obtain the maximum recovery for creditors

of the Debtor's estate if the Assets are sold through the proposed Bid Procedures.  As explained

in detail above, the Debtor has already taken significant steps to identify potential purchasers.

93.      Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify

creditors of the proposed sale of the Debtor's Assets, including a disclosure of the time and place

of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The

Debtor submits that the notice procedures herein comply fully with Bankruptcy Rule 2002 and

are reasonably calculated to provide timely and adequate notice of the sale by auction to the

Debtor's creditors and other interested parties, as well as to those parties who have expressed an

interest, or may express an interest, in bidding on the Assets.  The proposed time frame between

the filing of this Motion, the commencement of the bidding process and the Auction will provide

interested purchasers sufficient time to participate in the Auction.

**E.      The Breakup Fee is Appropriate Under the Circumstances**

94.      The Debtor submits that the Breakup Fee is a normal and oftentimes

necessary component of sales outside the ordinary course of business under Section 363 of the

43

Bankruptcy Code. In particular, such a protection encourages a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See, e.g., In re Comdisco, Inc.*, Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); *Integrated Resources*, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

95.     A proposed bidding incentive, such as the Breakup Fee should be approved when it is in the best interests of the estate. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104

(Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

96.     In *O'Brien Environmental Energy*, the Third Circuit found that whether breakup fees and expenses could be paid to Calpine Corp. as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate. *See* 181 F.3d at 536. The court determined that Calpine's right to break up fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. *Id.* at 537. The Debtor believes that approval of the Breakup Fee will create such a competitive bidding process.

97.     The Debtor believes that the proposed Breakup Fee is fair and reasonably compensates the Stalking Horse Purchaser for taking actions that will benefit the Debtor's estate. The Breakup Fee compensates the Stalking Horse Purchaser for diligence and professional fees incurred in negotiating the terms of the Purchase Agreement on an expedited timeline.

98.     The Debtor does not believe that the Breakup Fee will have a chilling effect on the sale process. Rather, the Stalking Horse Purchaser will increase the likelihood that

45

the best possible price for the Assets will be received, by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing qualified bidders to utilize the Purchase Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

99.     Payment of the Breakup Fee, if any, shall be made in accordance with the terms of the Purchase Agreement.  Section 8.2 of the Purchase Agreement provides that the Stalking Horse Purchaser will be entitled to receive from the Debtor's estate, payment of the Breakup Fee in cash or other immediately available good funds in the event the Stalking Horse Purchaser is not approved by the Court as the purchaser of the Assets and substantially all of the Assets are (a) sold to a Successful Bidder by and through the sale process envisioned by this Motion; or (b) within six (6) months following the Sale Hearing either (i) sold or (ii) an agreement is entered into sell such Assets that is ultimately consummated with any third party, which Breakup Fee payment shall be made to the Stalking Horse Purchaser concurrently with, and solely from the proceeds of, the consummation of such third party sale unless the third party sale is to a secured lender of Debtor submitting a credit bid.  In such an event, the Breakup Fee shall be allowed as a super-priority administrative expense claim under Sections 503(b) and 507 of the Bankruptcy Code, shall not be subordinated to any other administrative claim and shall be paid to the Stalking Horse Purchaser immediately upon closing.  The Breakup Fee shall, in no event, be paid from or out of the professional fee account established pursuant to the cash collateral order entered in the Debtor's chapter 11 case.  The conditions under which the Stalking

Horse Purchase is not entitled to the Breakup Fee are described in section 8.2 of the Purchase Agreement.

100.    Furthermore, the Breakup Fee, in the amount of $126,000, is approximately 4.5% of the Purchase Price, not including the Purchaser's assumption of the assumed liabilities provided under the Purchase Agreement, and is not inconsistent with termination fees approved by bankruptcy courts in chapter 11 cases.  Moreover, the Stalking Horse Purchaser is not requesting any expense reimbursement in addition to the Breakup Fee. *See, e.g., In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a breakup fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a breakup fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a breakup fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re Edison Bros. Stores. Inc., et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of

3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved breakup fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved breakup fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved breakup fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (Court approved breakup fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (Court approved breakup and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000).

101.    In sum, the Breakup Fee is reasonable under the circumstances and will enable the Debtor to maximize the value for the Assets while limiting any chilling effect in the sale process.

**F.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

102.    Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the

48

debtor." 11 U.S.C. § 365(a). Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

103.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

104.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

105.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

106.    The Debtor and the Successful Bidder(s) will present evidence at the Sale Hearing to prove the financial credibility, willingness, and ability of the Successful Bidder(s) to perform under the Assumed Executory Contracts.  The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder(s) to provide adequate assurance of future performance under the Assumed Executory Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

107.    In addition, the Debtor submits that the cure procedures set forth herein are appropriate, reasonably calculated to provide notice to any affected party, and afford the affected party to opportunity to exercise any rights affected by the Motion, and consistent with Section 365 of the Bankruptcy Code.  To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Purchase Agreement or the Successful Bidder's Competing Agreement.  Except as otherwise limited by Section 365 of the Bankruptcy Code, any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to Section 365(f)(1) of the Bankruptcy Code.

50

108.    Accordingly, the Debtor submits that the cure procedures for effectuating

the assumption and assignment of the Assumed Executory Contracts as set forth herein are

appropriate and should be approved.

**G.    The Successful Bidder Should be Afforded All**
**Protections Under Section 363(m) as A Good Faith Purchaser**

109.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's

interest in property purchased from the debtor's estate notwithstanding that the sale conducted

under section 363(b) is later reversed or modified on appeal.  Specifically, Section 363(m) states

that:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, *9

(S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986));

*see Allstate Ins. Co. v. Hughes*, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . .

provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the

appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to

11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal

unless there is a stay pending appeal").

110.    The selection of the Successful Bidder will be the product of arms' length,

good-faith negotiations in an anticipated competitive purchasing process.  The Debtor intends to

request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled

to the protections of section 363(m) of the Bankruptcy Code.

## H.    Relief from the 14-Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

111.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless

the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the

expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtor

requests that the Sale Order be effective immediately by providing that the 14-day stays under

Bankruptcy Rules 6004(h) and 6006(d) are waived.

112.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide

sufficient time for an objecting party to appeal before an order can be implemented.  *See*

Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy

Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court

should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier* suggests that

the 14-day stay period should be eliminated to allow a sale or other transaction to close

immediately "where there has been no objection to the procedure." *Collier on Bankruptcy* P

6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Furthermore, *Collier* provides

that if an objection is filed and overruled, and the objecting party informs the court of its intent to

appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

113.    The Debtor hereby requests that the Court waive the 14-day stay periods

under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is

filed, reduce the stay period to the minimum amount of time needed by the objecting party to file

its appeal.

### No Prior Request

114.    No prior request for the relief sought in this Motion has been made to this

or any other court.

### Notice

115.    Concurrently with this filing, copies of this Motion will be provided to (a)

the Office of the United States Trustee; (b) counsel to the Committee; (c) all parties who have

timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure;

(d) all parties who assert liens with respect to the Assets, including, but not limited to, the

prepetition lenders; (e) all entities known to have expressed an interest in bidding on the Assets,

including the Stalking Horse Purchaser; (f) all known counterparties to the Debtor's executory

contracts and unexpired leases; (g) the United States Attorney's office; (h) all state attorneys

general in states in which the Assets are located; (i) the Internal Revenue Service; (j) for each

state in which the Assets are located, the applicable taxing authorities; and (k) environmental and

certain other regulatory authorities in the states or applicable jurisdictions in which the Debtor's

assets are located.  In addition, within two (2) business days following entry of the Bid

Procedures Order, the Debtor will serve the Sale and Bid Procedures Notice and the Creditor

Notice as provided herein.  The Debtor respectfully submits that such notice is sufficient, and

request that the Court find that no further notice of the relief requested herein is required.

    **WHEREFORE**, the Debtor respectfully requests that the Court enter orders,

substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief

requested herein and such other and further relief as this Court deems appropriate.


Dated: May 24, 2017        PACHULSKI STANG ZIEHL & JONES LLP


    */s/ Laura Davis Jones*
    Laura Davis Jones (Bar No. 2436)
    David M. Bertenthal (CA Bar No. 167624)
    Joseph M. Mulvihill (Bar No. 6061)
    919 North Market Street, 17th Floor
    P.O. Box 8705
    Wilmington, Delaware  19899-8705 (Courier 19801)
    Telephone:  302-652-4100
    Facsimile:  302-652-4400
    email:  ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            jmulvihill@pszjlaw.com

    Counsel for Debtor and Debtor in Possession

DOCS_DE:212988.20 05436/001