# EXHIBIT B

**Blackline**

DOCS_DE:216051.1 05436/001

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AEI WINDDOWN, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 17-10500 (KJC) |

### DISCLOSURE STATEMENT WITH RESPECT TO DEBTOR'S PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN PROVISIONALLY APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE COURT.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joseph M. Mulvihill (Bar No. 6061)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
email:  ljones@pszjlaw.com
         dbertenthal@pszjlaw.com
         jmulvihill@pszjlaw.com

Counsel for Debtor and Debtor in Possession

Dated: ~~October 19~~November 9, 2017

---

[1] The Debtor in this chapter 11 case and the last four digits of the Debtor's U.S. tax identification number is AEI Winddown, Inc. (f/k/a Aquion Energy, Inc.) (1370). The Debtor's headquarters is located at AEI Winddown, Inc. (f/k/a Aquion Energy, Inc.), c/o Susan Roski, 1051 East Carey Street, Suite 602, Richmond, VA 23219.

DOCS_DE:215592.8 05436/001

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ......................................................................................................... 1

    A.   Solicitation Packages ............................................................................................ 3

    B.   Only Impaired Classes Vote ................................................................................. 4

    C.   Voting Procedures.................................................................................................. 4

    D.   Plan Objection Deadline ....................................................................................... 5

    E.   Confirmation Hearing ........................................................................................... 5

    F.   Overview of the Plan ............................................................................................ 5

II. BACKGROUND AND CHAPTER 11 CASE ............................................................. 7

    A.   Debtor's Business and Operations ........................................................................ 7

    B.   Capital Structure ................................................................................................... 8

        1.   Equity Structure ............................................................................................ 8

        2.   Significant Indebtedness ............................................................................... 8

    C.   Events Leading to the Bankruptcy Filing & Commencement of the Chapter 11 Case ...... 9

    D.   Events During the Chapter 11 Case .................................................................... 10

        1.   First Day and Cash Collateral Relief ......................................................... 10

            (a)   Cash Collateral Motion / Payment of Trinity Obligations................. 10

            (b)   Employee Wages/Benefits ................................................................ 10

            (c)   Other Early Relief ............................................................................ 11

        2.   Retention of Key Professionals / Appointment of Committee ..................... 11

            (a)   Debtor's Advisors ............................................................................ 11

            (b)   Committee ....................................................................................... 11

        3.   Sale Matters ................................................................................................ 11

            (a)   Sale of Substantially All of Debtor's Assets.................................... 11

            (b)   Private Sale of Machinery/Equipment .............................................. 13

            (c)   De Minimis Asset Sales ................................................................... 13

        4.   Lease/Contract Matters ............................................................................... 13

        5.   Bar Dates .................................................................................................... 14

        6.   Schedules / Statement of Financial Affairs................................................. 14

        7.   Miscellaneous Pleadings ............................................................................ 14

        8.   WARN Act Adversary Proceeding ............................................................. 15

III. SUMMARY OF THE PLAN...................................................................................... 15

    A.   General ................................................................................................................ 15

    B.   Classification and Treatment of Claims and Equity Interests.............................. 16

        1.   Unclassified Claims .................................................................................... 16

        2.   Classification and Treatment of Claims and Equity Interests....................... 17

    C.   Means for Implementation of the Plan................................................................ 19

        1.   Dissolution of Debtor.................................................................................. 19

        2.   Appointment of the Liquidating Trustee...................................................... 19

        3.   The Liquidating Trust ................................................................................. 19

        4.   Rights and Powers of the Liquidating Trustee............................................. 20

        5.   Fees and Expenses of the Liquidating Trust ............................................... 21

        6.   Transfer of Beneficial Interests in the Liquidating Trust............................. 21

        7.   Available Cash ............................................................................................ 21

8. Litigation ........................................................................................... 21
9. Dissolution of the Committee ............................................................ 22
10. Full and Final Satisfaction ................................................................ 22
11. Distribution Procedures .................................................................... 22
12. Liquidating Trust Assets Account .................................................... 23
13. Resolution of Disputed Claims ......................................................... 23
14. Reserve Provisions for Disputed Claims ........................................... 24
D. Unexpired Leases and Executory Contracts ............................................ 25
E. Conditions to Effectiveness ..................................................................... 26
F. Effects of Confirmation ............................................................................ 26
G. Preservation of Rights of Action. ............................................................ 30
H. Retention of Jurisdiction ......................................................................... 31
IV. VOTING REQUIREMENTS; ACCEPTANCE AND  CONFIRMATION OF THE PLAN 31
A. Parties in Interest Entitled to Vote ......................................................... 31
B. Classes Impaired Under the Plan ............................................................ 32
C. Voting Procedures and Requirements ...................................................... 32
D. Confirmation Standards ........................................................................... 32
E. Best Interests Test ................................................................................... 34
F. Liquidation Analysis ................................................................................ 34
G. Feasibility ................................................................................................. 35
H. Acceptance by Impaired Classes. ............................................................. 35
I. Compliance with the Applicable Provisions of the Bankruptcy Code ...... 36
V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........ 36
VI. RISK FACTORS ............................................................................................. 37
A. Risks Relating to Confirmation and Consummation of the Plan ............. 37
1. Parties in Interest May Object to Classification of Claims and Interests .... 37
2. The Debtor May Object to a Claim or Equity Interest ...................... 37
3. The Debtor May Fail to Satisfy the Vote Requirement .................... 38
4. Plan May Not Be Accepted, Confirmed or Consummated ................ 38
5. Non-Consensual Confirmation of the Plan May Be Necessary ........ 39
B. Risks Relating to the Chapter 11 Process ............................................... 39
1. The Debtor's Exclusivity Period May Terminate .............................. 39
2. Continuation of the Chapter 11 Case May Harm the Debtor's Estate ...... 39
3. The Chapter 11 Case May Be Converted to Cases Under Chapter 7 ........ 39
C. Risks Relating to Recoveries Under the Plan .......................................... 40
VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................... 40
A. Federal Income Tax Consequences to Certain Creditors ......................... 41
1. In General ........................................................................................ 41
2. Non-United States Persons .............................................................. 41
3. Tax Consequences in Relation to Liquidating Trust ........................ 42
B. Information Reporting and Backup Withholding .................................... 44
VIII. RECOMMENDATION .................................................................................... 45

*Solicitation Version*

# I.

# INTRODUCTION

The above-captioned debtor and debtor in possession (the "Debtor") has filed its proposed *Debtor's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated October 13, 2017 (as may be amended or modified, the "Plan"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is attached hereto as **Exhibit A**.[2] The Debtor hereby submits this Disclosure Statement with respect to the Plan (as may be amended or modified, the "Disclosure Statement"), pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan from certain Holders of Claims against the Debtor.

~~The Court will hold a hearing on **November 9, 2017 at 11:00 a.m. prevailing Eastern Time** to consider the provisional approval of the Disclosure Statement, and to approve of the forms of Plan ballots and notice, as well as set a time for a hearing to give final approval to the Disclosure State and confirm the Plan of liquidation.~~

On November 7, 2017, the Court entered the *Order (I) Conditionally Approving the Disclosure Statement; (II) Scheduling a Plan Confirmation Hearing and Approving Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Form of Ballot; and (V) Granting Related Relief* [Docket No. 416], which granted provisional approval of the Disclosure Statement and approved of the forms of Plan ballots and notices, as well as set **December 19, 2017, at 11:00 a.m. (Eastern Time)** as the time for the hearing to consider final approval of the Disclosure Statement and confirm the Plan of liquidation.

If confirmed and consummated, the Plan will facilitate the orderly wind down of the Debtor's remaining business, including formation of a liquidating trust to pursue any remaining causes of action, liquidate remaining assets, and distribute all proceeds according to the Plan, among other things before finally closing these cases.

The Debtor seeks Bankruptcy Court approval of the Plan. Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. This Disclosure Statement is being submitted in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the Debtor's corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article II)
- events leading to the Chapter 11 Cases, including the Debtors' restructuring negotiations (Article II)

---

[2] Capitalized terms used herein that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

- significant events in the Chapter 11 Cases (Article II);
- the classification and treatment of Claims and Interests under the Plan (Article III), including who is entitled to vote and how to vote on the Plan (Article IV);
- certain important effects of Confirmation of the Plan (Articles VI and VII);
- releases contemplated by the Plan (Article III);
- the statutory requirements for confirming the Plan (Article IV);
- certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article V and VI); and
- certain United States federal income tax consequences of the Plan (Article VII).

In light of the foregoing, the Debtor believes this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code. Pursuant to Section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."

All creditors entitled to vote to accept the Plan should return their Ballots (as defined herein), so as to be **actually received** by the Claims Agent no later than [—————, 2017]**December 12, 2017, at 4:00 p.m. prevailing Eastern Time**. Assuming the requisite acceptances to the Plan are obtained, the Debtor will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assured, and/or performed in connection with the consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

**NOTHING CONTAINED IN THIS DOCUMENT SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE DEBTOR OR ANY OTHER PARTY IN INTEREST, SINCE THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS REMAINS, *INTER ALIA*, SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED HEREIN IS PRELIMINARY AND DEVELOPMENTS MAY OCCUR THAT REQUIRE MODIFICATIONS OR ADDITIONS TO, OR DELETIONS FROM, THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS. THIS DISCLOSURE STATEMENT HAS BEEN PROVISIONALLY APPROVED BY THE COURT AND HAS NOT YET BEEN GRANTED FINAL APPROVAL.**

THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS ARE THE ONLY DOCUMENTS THAT CREDITORS AND OTHER PARTIES IN INTEREST SHOULD

CONSIDER IN CONNECTION WITH CONFIRMATION OF THE PLAN, INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN.  NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT.  ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

PROVISIONAL APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  AFTER CAREFULLY REVIEWING THESE DOCUMENTS, IF YOU ARE A CLAIM HOLDER ENTITLED TO VOTE, PLEASE INDICATE YOUR VOTE WITH RESPECT TO THE PLAN ON THE ENCLOSED BALLOT AND RETURN IT IN THE ENVELOPE PROVIDED.

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN THIS CASE SUPPORTS THE PLAN.

## A.    Solicitation Packages

On [⎯⎯⎯⎯⎯⎯, 2017]November 7, 2017, the Bankruptcy Court entered an order provisionally approving the Disclosure Statement (the "Disclosure Statement Order").  Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (collectively, the "Solicitation Package"), including:

- the Disclosure Statement, as provisionally approved by the Bankruptcy Court (with all exhibits thereto);
- the Plan (Exhibit A to the Disclosure Statement);
- the Disclosure Statement Order (without exhibits thereto);
- the Solicitation Procedures;
- the Combined Hearing Notice;
- an appropriate Ballot with voting instructions with respect thereto, together with a pre-addressed, postage prepaid return envelope;
- a letter from the Committee urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

- a cover letter from the Debtor (1) describing the contents of the Solicitation Package, and (2) urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan; and
- any supplemental documents the Debtors may file with the Bankruptcy Court prior to solicitation or that the Bankruptcy Court orders to be made available.

**B.    Only Impaired Classes Vote**

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under the Plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan and shall not be afforded an opportunity to vote to accept or reject the Plan.

Under the Plan, Claims and Equity Interests in Classes 3, 4 and 5 are Impaired. Holders of Equity Interests in Class 5 will receive no distribution, and, accordingly, such Equity Interest holders are deemed to reject the Plan, and their votes are not being solicited. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4.

**C.    Voting Procedures**

The deadline to vote on the Plan is [————————, 2017]December 12, 2017, at 4:00 p.m., prevailing Eastern Time (the "Voting Deadline"). All votes to accept or reject the Plan must be received by the Debtor's voting agent, Kurtzman Carson Consultants, LLC (the "Voting Agent") by the Voting Deadline.

Ballots must be actually received by the Voting Agent by the Voting Deadline at the following address, whether sent by first class mail, personal deliver, or overnight courier:

**Aquion Energy, Inc. Ballot Processing Center
c/o KCC
2335 Alaska Ave.
El Segundo, CA 90245**

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate ballot. All ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each ballot; (b) overnight delivery; or (c) personal delivery, so that the ballots are actually received by the Voting Agent no later than the Voting Deadline at the return address set forth in the applicable ballot. Any ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an

acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.  Ballots received by facsimile or by electronic means will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one ballot for each Claim held by such Holder.  By signing and returning a ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtor that no other ballots with respect to such Claim has been cast or, if any other ballots have been cast with respect to such Claim, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot, as failing to do so may result in the ballot not being counted.

### D.    Plan Objection Deadline

The Bankruptcy Court has established [————————, 2017]December 12, 2017, at **4:00 p.m.**, prevailing Eastern Time, as the deadline to object to confirmation of the Plan (the "Plan Objection Deadline").  All such objections must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in interest in accordance with the Disclosure Statement Order and Solicitation Procedures so that they are actually received on or before the Plan Objection Deadline.  The Debtor believes that the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtor, and other parties in interest reasonable time to consider the objections to the Plan before a Confirmation Hearing.

### E.    Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider final approval of the Disclosure Statement and confirmation of the Plan for [————————December 19, 2017, at ————.m11:00 a.m. (ET)] in the Bankruptcy Court, located at 824 N. Market Street, 5th Floor, Courtroom 5, Wilmington, DE 19801 (the "Confirmation Hearing").  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing.  The Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest, subject to the terms of the Plan.

### F.    Overview of the Plan

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.  CREDITORS AND OTHER PARTIES IN

INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE
PLAN CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF.

The Plan is a plan of liquidation, pursuant to which the net proceeds of the sale or other
disposition of the Debtor's remaining assets will be pooled (together with net cash proceeds from
the postpetition sale of substantially all of the Debtor's assets, as discussed below) and
distributed, first to Holders of Allowed Secured Claims, if any (subject to the Debtor's election
of alternative treatments provided for Secured Claims under the Plan and solely to extent of the
value of the collateral which secured such Claim), then to the Holders of Allowed
Administrative, Priority Tax Claims, and Priority Non-Tax Claims in accordance with the
scheme of priorities set forth in the Bankruptcy Code, and thereafter to Holders of Allowed
Convenience Claims and Allowed Unsecured Claims.  Holders of Equity Interests are not
receiving any distribution under the Plan.

Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and are
to be paid in full, or upon such other terms as the Debtor and the affected Claimants may agree.
Class 1 Priority Non-Tax Claims are unimpaired, and Holders of Allowed Priority Non-Tax
Claims are to be paid in full or upon such other terms as the Debtor and the affected Holders may
agree.  With regard to Class 2 Secured Claims, except to the extent previously paid in full to the
extent of its Allowed Secured Claim as determined in accordance with Bankruptcy Code section
506, at the option of the Debtor or the Liquidating Trustee, as applicable, one of the following
treatments will be provided: (i) the Holder of such Claim shall retain its Lien on its collateral
until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of
such collateral, shall be paid to such Holder in full satisfaction, release, and discharge of such
Allowed Secured Claim; (ii) on or as soon as practicable after the later of the Effective Date or
the date on which the Secured Claim becomes Allowed, or as otherwise agreed between the
parties, the Holder of such Secured Claim will receive a Cash payment equal to the amount of its
Allowed Secured Claim; or (iii) the applicable collateral will be abandoned to such Creditor.
Class 2 Secured Claims are unimpaired under the Plan.  Class 3 Convenience Claims are
impaired and each Holder of an Allowed Class 3 Claim shall receive, in full and final satisfaction
of its Claim, Cash equal to the Allowed amount of such Claim.  Class 4 Unsecured Claims are
impaired and each Holder of an Allowed Class 4 Claim will receive its Pro Rata distribution
from the Liquidating Trust Interests following the payment or reserve for Administrative Claims,
Priority Tax Claims, Priority Non-Tax Claims, Secured Claims and Convenience Claims.  Class
5 Equity Interests are impaired and will not receive a distribution.

Set forth below is a table summarizing the classification of and estimated recoveries on
account of Allowed Claims and Equity Interests under the Plan.  The actual distributions may
differ from those set forth in the table depending on the amount of Claims ultimately allowed in
each category or Class and the extent of Liquidating Trust Assets ultimately available for
distribution.

| DESCRIPTION/CLASS | ESTIMATED ALLOWED AMOUNT | ESTIMATED DISTRIBUTION (%) |
|---|---|---|
| Administrative Claims | $900,000 | 100% |
| Priority Tax Claims | $60,000 | 100% |

| DESCRIPTION/CLASS | ESTIMATED ALLOWED AMOUNT | ESTIMATED DISTRIBUTION (%) |
|---|---|---|
| Class 1 Priority Non-Tax Claims | $22,000 | 100% |
| Class 2 Secured Claims | $800,000 | 100% |
| Class 3 Convenience Claims | $250,000 – 500,000 | 50%[3] |
| Class 4 Unsecured Claims | $19,500,000 – 25,400,000 | 15-22%[4] |
| Class 5 Equity Interests | N/A | 0% |

## II.

## BACKGROUND AND CHAPTER 11 CASE

### A.    Debtor's Business and Operations

Based in Pittsburgh, Pennsylvania, the Debtor was founded in 2008 by Jay Whitacre, PhD, at Carnegie Mellon University.  The Debtor had its first commercial product launch in 2014.  As of 2016, the Debtor's annual revenues exceeded $10 million.

Prior to the Petition Date, the Debtor manufactured saltwater batteries with a proprietary, environmentally-friendly electrochemical design.  The Debtor's batteries were used for stationary energy storage in a variety of applications and were suitable for use in pristine environments, island locations, homes and businesses.  The Debtor's batteries contained no heavy metals or toxic chemicals and were non-flammable and non-explosive.  The Debtor's batteries were Cradle to Cradle Certified™, an environmental sustainability certification that had never previously been given to a battery producer.

The Debtor's "Aspen" batteries applications included the following:  (i) telecommunications (e.g., remote telecommunications towers providing cellular service); (ii) microgrid energy storage (e.g., powering small networks of electricity users that can function independently of a centralized national grid, including large commercial, industrial, and military installations); (iii) off-grid lighting (cost-effective indoor and outdoor energy systems); (iv) commercial and industrial energy storage (enabling storage and dispatch of energy on demand to avoid using grid power at the costliest times of day); (v) grid energy storage (that are designed to augment or replace generation, transmission, and distribution assets across the grid); and (vi) green residential and commercial building energy storage.

The Debtor distributed its batteries primarily through a network of dealers and distributers which sold and installed the Debtor's batteries to the end customers.  For large-scale commercial, industrial, utility, and OEM applications, the Debtor worked directly with customers to design and implement high-performance energy storage systems.  The Debtor's

---

[3]  The aggregate amount of distributions to Convenience Claims shall be limited to $250,000.  *See* Article III.B.2.
[4]  Estimated distribution to Unsecured Claims includes reduction in available funds for Liquidating Trust expenses and other wind down costs.

batteries were also sold as components of systems which included the Debtor's batteries in conjunction with third party equipment.

Prior the Petition Date, in addition to its Pittsburgh headquarters, the Debtor utilized a 330,000 square-foot manufacturing space in Mt. Pleasant, Pennsylvania, and a 29,000 square-foot manufacturing/warehouse facility in Belle Vernon, Pennsylvania. All of the Debtor's facilities were leased. As of the Petition Date, the Debtor reduced its workforce to a total of approximately 19 full-time employees and 12 part-time employees/consultants. As discussed below, shortly prior to the Petition Date, the Debtor terminated substantially all of its former employees, each of whom were paid, as of the termination date, their respective outstanding wages, accrued paid time off, and certain payments that would be credited to the extent the Debtor were adjudicated to have any liability under any federal or state WARN act statutes.

## B.     **Capital Structure**

### 1.     **Equity Structure**

The Debtor is a privately-owned Delaware corporation. The Debtor's equity is held in various issuances/classes of preferred and common stock. Among the Debtor's primary equity investors are: KPCB Holding, Inc.; Foundation Capital VI, LP; Advanced Technology Ventures VII, L.P.; Onwell Enterprise Holdings, Inc.; Tao, LLC; Gates Ventures, LLC; DNS-AQN, LLC; Constellation NewEnergy, Inc.; and Total Energy Ventures International, S.A.S, among others.[5] More than $180 million of equity capital was raised prepetition, including a management-led effort as recently as November 2016.

### 2.     **Significant Indebtedness**

Prior to the Petition Date, the Debtor entered into the *Master Loan and Security Agreement*, dated as of May 1, 2014, as amended, supplemented or otherwise modified from time to time prior to the date hereof (the "Trinity Loan Agreement" and together with all agreements, documents, notes, security agreements, pledges, guarantees, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Trinity Loan Documents") with Trinity Capital Fund II, L.P. ("Trinity") as lender to provide term loans totaling up to $20 million. (All references to Trinity herein include CapXFund IV, L.P., which was not a lender, but was a participant in the loans extended under the Trinity Loan Agreement.) The obligations under the Trinity Loan Agreement were scheduled to mature on the last day of the forty-second (42nd) month following the date of the initial term note. As of the Petition Date, the Debtor's obligations under the Trinity Loan Documents totaled no more than $4,409,538 in principal obligations, plus an "End of Term Payment" in the amount of $750,000 or 5% of the original balance of term notes (total advances were originally $15 million).

All of the obligations owing to Trinity under the Trinity Loan Agreement (the "Trinity Prepetition Claims") were asserted to be secured by liens (the "Prepetition Liens") on

---

[5] A complete list of the Debtor's equity holders was filed with the Debtor's chapter 11 petition.

substantially all of the Debtor's assets (the "Prepetition Collateral"), including cash collateral as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"). The Prepetition Liens were subject to certain "Permitted Liens" as defined in the Trinity Loan Agreement, which include, among other items: (a) purchase money security interests or liens in connection with operating or capital leases for equipment and loans for equipment not exceeding $12,000,000 in principal amount outstanding at any time; (b) liens on accounts receivables or inventory securing working capital debt facilities not to exceed $5,000,000 in principal amount outstanding at any time; and (c) liens securing certain permitted scheduled debt. As described in detail below, all Prepetition Trinity Claims have been paid in full from the proceeds of the Debtor's sale.

As of the Petition Date, the Debtor had certain outstanding purchase money secured indebtedness in the aggregate principal amount of approximately $6.1 million that was secured by the Debtor's equipment. The Debtor believes that the value of the equipment securing this indebtedness is significantly lower than the face value of the principal amount. As of the Petition Date, the Debtor also had certain secured indebtedness secured by leasehold improvements. As described in detail below, because the buyer did not seek to assume any of the Debtor's real property leases, the Debtor has rejected all such leases. Thus, any secured claims secured by leasehold improvements have no value.

As of the Petition Date, the Debtor's preliminary estimate of general unsecured debt totaled approximately $13 million, which estimate included potential unliquidated and/or contingent claims. As of October 1, 2017, approximately $14 million in general unsecured claims were asserted in filed proofs of claim.

## C.      Events Leading to the Bankruptcy Filing & Commencement of the Chapter 11 Case

As of the Petition Date, the Debtor's unique and ground-breaking technology had not generated sufficient sales to offset its start-up and operating costs and achieve profitability. The Debtor's EBITDA for year-end 2015 and 2016 constituted losses of approximately $38.4 million and $31 million, respectively. The Debtor's tenuous financial condition impeded its ability to raise sufficient additional capital on terms that would enable the Debtor to continue operations.

Absent significant cost-cutting measures, the Debtor's cash burn at full operation was unsustainable and would almost immediately drive the Debtor into a forced liquidation. Accordingly, as of the Petition Date, the Debtor ceased its manufacturing and marketing operations and stopped selling its products. Moreover, the Debtor reduced its employee headcount by about 85%. As noted above, after the Petition Date, approximately 19 full-time employees and 12 part-time employees/consultants assisted to transition the Debtor in chapter 11 and to continue operations only as necessary to preserve and maximize the value of the assets pending the chapter 11 sale process.

In October 2016, the Debtor engaged Citi Global Markets, Inc. ("Citi") as investment bankers to undertake a marketing process for the Debtor or its assets or a capital raise. During the pendency of Citi's engagement, the Debtor attracted several interested parties. However, Citi was unsuccessful in raising capital or attracting a successful buyer prepetition.

During the bankruptcy case, the Debtor undertook a robust, expedited, sales process, resulting in a successful sale yielding substantial proceeds for distributions to creditors under the Plan (as discussed further herein).

## D.   Events During the Chapter 11 Case

### 1.   First Day and Cash Collateral Relief

In order to facilitate the Chapter 11 Case, minimize disruption to the Debtor's affairs, and preserve the value of the bankruptcy estate, the Debtor filed motions with the Bankruptcy Court on or shortly after the Petition Date seeking certain relief, including but not limited to, the relief summarized below. The relief sought is typical in a chapter 11 case of this size and complexity. Copies of all relevant pleadings are on file with the Bankruptcy Court and can be obtained free of charge by accessing the noticing/claims agent's website at https://www.kccllc.net/aquion.

### (a)   Cash Collateral Motion / Payment of Trinity Obligations

On the Petition Date, the Debtor filed its *Motion of Debtor for Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 13], seeking authority to use cash collateral and grant adequate protection to Trinity Capital Fund II, L.P. ("Trinity"), its secured lender, by, among other things, maintaining a sufficient amount of cash (approximately $5.16 million) to pay Trinity's asserted secured claim in full and by providing certain replacement and adequate protection liens and making adequate protection (non-default interest and reimbursable expenses) payments. The Debtor believed that Trinity was oversecured as of the Petition Date. Trinity filed a limited objection [Docket No. 27], asserting first priority liens on substantially all of the Debtor's assets, and objecting to, among other things, certain provisions in the proposed interim order and to the absence of other customary provisions viewed by Trinity as reasonable and necessary to adequately protect Trinity's interests. The Court granted this motion, subject to certain modifications, on an interim basis on March 10, 2017 [Docket No. 33]. On June 5, 2017, the Court entered the final cash collateral order [Docket No. 202].

Subsequent to the Court's approval of the sale of substantially all of the Debtor's assets (discussed below), the Debtor, the Committee, and Trinity agreed to pay off the Debtor's obligations under the Trinity Loan Documents and further fund the Segregated Account containing amounts for the payment of Professionals' fees and U.S. Trustee costs (as said capitalized terms are defined in the final cash collateral order), which stipulation was approved by the Court on July 21, 2017 [Docket No. 288].

### (b)   Employee Wages/Benefits

On the Petition Date, the Debtor filed its *Motion for Entry of an Order Authorizing the Debtor to (i) Pay and/or Honor Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (ii) Remit Withholding Obligations and Deductions; (iii) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (iv)*

*Have Applicable Banks and Other Financial Institutions Receive, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* [Docket No. 9], seeking authorization to honor and/or pay (as applicable) prepetition employee wages and health and various other employee benefits and programs, subject to certain caps, and obtain certain other related relief.  Prior to the Petition Date, the Debtor employed approximately 143 employees, the majority of which were terminated, each of whom were paid, as of the termination date, their respective outstanding wages, accrued paid time off, and certain payments that would be credited to the extent the Debtor were adjudicated to have any liability under any federal or state WARN act statutes.  As of the Petition Date, 19 employees remained, as well as 12 independent contractors.  The Court granted this motion on March 10, 2017 [Docket 30].

### (c)     Other Early Relief

Other first day relief included, without limitation, orders (i) permitting the Debtor's continued use of its existing cash management system [Docket Nos. 14 & 34]; (ii) establishing procedures for providing adequate assurance of future performance to the Debtor's utility providers [Docket Nos. 12, 32 & 121]; and (iii) permitting the Debtor to pay certain prepetition sales, use, franchise and other taxes (up to $30,000) [Docket Nos. 11 & 31].

### 2.     Retention of Key Professionals / Appointment of Committee

### (a)     Debtor's Advisors

As approved by orders of the Bankruptcy Court, the Debtor retained (i) Protiviti, Inc., to provide Suzanne Roski as Chief Restructuring Officer of the Debtor and additional restructuring support personnel, as of the Petition Date [Docket No. 132]; (ii) Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel [Docket No. 93]; (iii) Morgan, Lewis & Bockius LLP as special counsel [Docket No. 136]; and (iv) Kurtzman Carson Consultants LLC as claims, noticing, and balloting agent [Docket No. 29].

### (b)     Committee

On March 31, 2017, the Office of the United States Trustee appointed the Committee. The members of the Committee are Tronox, LLC; The RIDC Regional Growth Fund; and Leverton Clarke LTD.

As approved by orders of the Bankruptcy Court, the Committee retained (i) Lowenstein Sandler LLP as lead counsel [Docket No. 145], and (ii) Klehr Harrison Harvey Branzburg LLP as Delaware co-counsel [Docket No. 146].

3.    **Sale Matters**

(a)    **Sale of Substantially All of Debtor's Assets**

Both before and after the Petition Date, the Debtor engaged in substantial efforts to identify and/or attract entities interested in purchasing substantially all of the Debtor's assets associated with its battery technology.

As noted above, in October 2016, the Debtor engaged Citi as investment bankers to undertake a marketing process for the Debtor, its assets or to raise additional capital.  During Citi's engagement, the Debtor contacted several interested parties, but Citi was unsuccessful in attracting a buyer or obtaining a capital raise.  The Debtor's management, however, continued its marketing efforts through and subsequent to the Petition Date.  Shortly after filing its chapter 11 petition, the Debtor reached out to 22 parties Citi had contacted during the earlier marketing process.  The Debtor provided, via electronic mail, notification that it had filed its chapter 11 petition, a "teaser" document with key details about the Debtor, and a nondisclosure agreement. None of those parties had participated in the Debtor's sale process to date.  The Debtor also contacted, on an individual basis, approximately 6 other parties it assessed as likely to participate in a potential sale effectuated under section 363 of the Bankruptcy Code.  These 6 parties generally had not been interested in purchasing the Debtor's assets outside of chapter 11 and included an existing Aquion investor that had already performed diligence on the Debtor and 5 large U.S. based and international firms.  Beginning on the Petition Date, additional parties began contacting the Debtor expressing interest in acquiring all or substantially all of the Debtor's assets.  Approximately 39 such parties made expressions of interest with 33 executing the Debtor's NDA.  Interested parties included certain of Aquion's distributors or licensed resellers, battery manufacturers, energy/petrochemical companies, private equity firms, renewable energy companies, and other parties in interest.

In April 2017, a stalking horse purchaser – Bluesky Energy US, Inc. – submitted a letter of intent to buy the Debtor's business.  Shortly thereafter, the Debtor negotiated and entered into a purchase agreement with the stalking horse, pursuant to which the stalking horse agreed to purchase the Debtor's assets for $2.8 million, in addition to the assumption of certain liabilities and subject to certain adjustments

On May 24, 2017, the Debtor filed its *Motion for Entry of an Order (I) (A) Authorizing Entry Into the Asset Purchase Agreement with Respect to the Sale of Substantially All of the Debtor's Assets, (B) Approving Bid Procedures for the Sale of Substantially All of the Assets of Debtor, (C) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notices Related Thereto, (D) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts and Leases, Including Notice of Proposed Cure Amounts, (E) Approving Certain Breakup Fee Provisions; (II) Authorizing and Approving (A) the Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Interests and (B) the Assumption and Assignment of Certain Contracts and Leases; and (III) Granting Related Relief* [Docket No. 168] (the "Sale/Procedures Motion"), seeking, among other relief, approval of the sale, free and clear of all liens and encumbrances, of substantially all of the Debtor's assets

(including the assumption/assignment of certain contracts and leases) to the stalking horse or other successful overbidder, and approval of certain sale and bid procedures in connection therewith. The Court approved certain bid procedures and granted related relief (including approval of a $126,000 breakup fee) pursuant to an order entered on June 6, 2017 [Docket No. 210].

On June 20, 2017, the Debtor conducted an auction pursuant to the Court-approved procedures. At the conclusion of the auction, Juline-Titans LLC was deemed to have submitted the highest and best offer for substantially all of the Debtor's assets. The final sale price was $9.164 million – many millions of dollars greater than the stalking horse offer. On June 21, 2017, the Court entered an order approving the sale [Docket No. 248]. This sale was subsequently consummated by the parties.

**(b)    Private Sale of Machinery/Equipment**

On May 10, 2017, the Debtor filed a *Motion for Order Under Sections 105, 363, 1107 and 1108 of the Bankruptcy Code (I) Approving Private Sale of Certain Assets Free and Clear of Liens, Claims and Interests Thereunder and (II) Granting Related Relief* [Docket No. 151], seeking authority to sell, by private sale to Federal Machinery & Equipment Company, certain machinery and equipment for approximately $400,000, free and clear of all liens and encumbrances. The Court granted this motion pursuant to an order entered on May 30, 2017 [Docket No. 187].

**(c)    De Minimis Asset Sales**

On March 21, 2017, the Debtor filed a *Motion for the Entry of an Order Approving Procedures for the Sale, Transfer, and Abandonment of De Minimis Assets* [Docket No. 58], seeking authority to approve streamlined procedures for the sale, transfer, and abandonment of certain surplus, obsolete, non-core, or burdensome assets (including laptops, computer equipment and office furniture) with a selling price of $300,000 or less, free and clear of all liens. The Court granted this motion pursuant to an order entered on April 10, 2017 [Docket No. 94].

**4.    Lease/Contract Matters**

On March 9, 2017, the Debtor filed its *First Omnibus Motion for Entry of an Order Authorizing the Debtor to Reject Certain Unexpired Lease and Executory Contracts Nunc Pro Tunc to the Petition Date* [Docket No. 23] (the "First Rejection Motion"), seeking authority to reject one real property (satellite office) lease and 14 certain contracts (relating to various pieces of personal property). The Court granted this motion on April 25, 2017 [Docket No. 122].

On July 14, 2017, the Debtor filed its *Second Omnibus Motion for Entry of an Order Authorizing the Debtor to Reject Certain Unexpired Lease and Executory Contracts Nunc Pro Tunc to the Rejection Date* [Docket No. 274], seeking authority to reject another 56 contracts. The Court granted this motion on August 2, 2017 [Docket No. 304].

On September 7, 2017, the Debtor filed its *Third Omnibus Motion for Entry of an Order Authorizing the Debtor to: (A) Reject Certain Unexpired Leases and Executory Contracts Nunc Pro Tunc to the Rejection Effective Date; (B) Abandon Any Remaining Personal Property Located at the Leased Premises Pursuant to 11 U.S.C. §§ 554; and (C) Fix a Bar Date for Claims of Counterparties* [Docket No. 343], seeking authority to reject an additional two leases and three contracts.  The Court granted this motion on September 26, 2017 [Docket No. 367].

5.    **Bar Dates**

On July 31, 2017, the Debtor filed *Debtor's Motion for an Order (I) Establishing Bar Dates for Filing Claims, Including 503(b)(9) Claims; (II) Establishing the First Administrative Bar Date; and (III) Approving the Form and Manner of Notice Thereof* [Docket No. 302], seeking to, among other things, establish September 29, 2017 as the general bar date by which all entities (except as otherwise provided) must file proofs of claim asserting a claim against the Debtor that arose prior to the Petition Date (including claims under sections 503(b)(9), 507(a)(4) or 507(a)(5)), the date by which governmental units must file proofs of claim, and the date by which holders of administrative claims arising between the Petition Date and August 1, 2017, must file said claims against the Debtor.  The Court granted this motion pursuant to an order entered on August 16, 2017 [Docket No. 315].

6.    **Schedules / Statement of Financial Affairs**

On April 11, 2017, the Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 99 & 100] with the Bankruptcy Court.  Subject to all of the conditions and assumptions set forth therein, the Debtor scheduled approximately $7.7 million in personal property assets; approximately $13.2 million in secured claims (some of which claims have been paid during the Chapter 11 Case pursuant to Court orders); approximately $799,000 in priority claims (some of which claims have been paid postpetition pursuant to Court orders); and approximately $12.9 million in general unsecured claims.

7.    **Miscellaneous Pleadings**

On March 8, 2017, the Debtor filed a motion [Docket No. 7] requesting authority to employ certain professionals used in the ordinary course of business without the need to file individual employment and fee applications of such professionals.  The Court granted this motion on April 10, 2017 [Docket No. 92].

On April 14, 2017, the Debtor filed a *Motion for Approval of Settlement Agreement Between Aquion Energy and Fluid Energy* [Docket No. 105], seeking approval of a settlement between the Debtor and Fluid Energy resolving a civil action, by, *inter alia*, the payment of $75,000 by Fluid Energy to the Debtor.  The Court granted this motion on April 28, 2017 [Docket No. 128].

On July 19, 2017, the Debtor and the RIDC Fund for Economic Growth ("RIDC") entered into a stipulation agreeing to a full and final satisfaction of RIDC's secured claim in this

case and resolving RIDC's objection to the sale of the Debtor's assets.  On the same date, the Court entered an order approving the stipulation.

### 8.    WARN Act Adversary Proceeding

On March 30, 2017, Bryan A. Dilascio, on behalf of himself and a putative class of former employees of Aquion Energy, Inc. (collectively, the "WARN Plaintiffs"), separately commenced an adversary proceeding in the Bankruptcy Court (Adv. No. 17-50337) against the Debtor.  The WARN Plaintiffs allege violations of the Workers Adjustment and Retraining Notification Act ("WARN Act") 29 U.S.C. §§ 2101-2109.  On July 14, 2017, the Debtor filed an answer to the WARN Plaintiffs' complaint in which it asserted a number of defenses, including but not limited to, the faltering company defense, the unforeseeable business circumstances defense, and the extent that the Debtor did not terminate at least fifty (50) employees at any single site of employment.  Further, the Debtor's answer included the defense that any of the WARN Plaintiffs' claims must be offset by the amounts collected by the WARN Plaintiffs for severance at termination.

On September 15, 2017, the WARN Plaintiffs filed their *Plaintiffs Motion for Class Certification and Related Relief* [Docket No. 19, Adv. Proc. No. 17-50337] (the "Class Certification Motion") seeking certification of a class of claimants pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, made applicable by the Federal Rule of Bankruptcy Procedure 7023.  The Debtor's deadline to respond to the Class Certification Motion is October 20, 2017.

The Debtor vigorously disputes liability, amount and characterization of the WARN Act claims asserted by the WARN Plaintiffs.

### III.

### SUMMARY OF THE PLAN

#### A.    General

The Plan is a plan of liquidation that contemplates the sale or other disposition of the Debtor's remaining assets (including the prosecution of certain Causes of Action) and the distribution of the net proceeds thereof and the remaining net proceeds realized from the earlier sale of substantially all of the Debtor's assets, to the Debtor's creditors.  As a result of the Debtor's asset disposition efforts, the Debtor presently has approximately $6.8 million in cash available for payment of expenses related to liquidation and distribution under the Plan.

Under the Plan, available proceeds will be distributed first to satisfy the Allowed Administrative Claims, Priority Tax Claims, Class 1 Priority Non-Tax Claims, Class 2 Secured Claims and Class 3 Convenience Claims in accordance with the scheme of priorities under the Bankruptcy Code.  After payment in full of such Claims, the net cash available shall be paid Pro Rata to satisfy the Class 4 Unsecured Claims.  Class 5 Equity Interests shall receive no

distribution under the Plan.

**B.**   **Classification and Treatment of Claims and Equity Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

   1.   **Unclassified Claims**

       Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has not placed the following Claims in a Class:

       Administrative Claims.  Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtor or the Liquidating Trustee, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), such fees will be paid as and when due under applicable law.

       Requests for the allowance and payment of Administrative Claims other than Professional Fee Claims, for the period from the Petition Date through August 1, 2017, had a bar date of September 29, 2017 (the "First Administrative Claims Bar Date"), as set by order of this court [Docket No. 315].  Any Administrative Claims arising during this period filed after September 29, 2017 are barred, absent further order from this Court.

       The Plan sets an additional bar date (the "Second Administrative Claims Bar Date") to file a request for the allowance and payment of Administrative Claims other than Professional Fee Claims, which may arise on or after August 2, 2017 through and including the Effective Date.  The Second Administrative Claims Bar Date shall be sixty (60) days after the Effective Date.

       Holders of Administrative Claims not subjection to the First Administrative Claims Bar Date (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code) that do not file such requests by the applicable deadline provided for in the Plan may be subject to objection for untimeliness and may be prohibited by order of the Bankruptcy Court from asserting such claims against the Debtor, the Estate, the Liquidating Trust, or their successors or

assigns, or their property.  Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

Notwithstanding any provision in the Plan regarding payment of Administrative Claims to the contrary, and without waiver of any argument available that such Claim is already time-barred by prior orders of the Bankruptcy Court, all Administrative Claims that are required to be filed and not filed by, as applicable, the First Administrative Claims Bar Date and Second Administrative Claims Bar Date will be deemed disallowed and discharged.  Without limiting the foregoing, all fees due and payable under 28 U.S.C. § 1930 that have not been paid will be paid on or before the Effective Date.

Professional Fee Claims.  Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date.  All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.  For avoidance of doubt, the Liquidating Trustee is not authorized under the Plan to object to applications for final allowance of compensation and reimbursement of expenses.

Priority Tax Claims.  Priority Tax Claims consist of any Claims of a Governmental Unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, the Liquidating Trust will pay each holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim on the earliest of the following dates: (i) on or as soon as practicable after the Effective Date, (ii) on or as soon as practicable after the date such Allowed Priority Tax Claim becomes an Allowed Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

The Debtor estimates that the total amount of unpaid Allowed Administrative Claims (including those of Professionals) as of the Effective Date will be approximately $900,000.  The Debtor estimates that the total amount of Allowed Priority Tax Claims will be approximately $60,000.

2.     **Classification and Treatment of Claims and Equity Interests.**

The Plan classifies and treats other Claims and Equity Interests as follows:

Class 1 Claims - Priority Non-Tax Claims.  Class 1 consists of Priority Non-Tax Claims.  Class 1 is not an Impaired Class, and Holders of Priority Non-Tax Claims are not entitled to vote on the Plan.  The Liquidating Trustee will pay the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later

of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Liquidating Trustee will pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided, however,* that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity. The Debtor estimates that approximately $22,000 of Priority Non-Tax Claims will be Allowed Class 1 Claims.

Class 2 Claims - Secured Claims. Class 2 consists of Secured Claims. For purposes of distributions under the Plan, each Holder of a Secured Claim in Class 2 is considered to be in its own separate subclass within Class 2 (*i.e.*, Class 2A, Class 2B, *etc.*), and each such subclass is deemed to be a separate Class for purposes of the Plan. Class 2 is not an Impaired Class, and Holders of Secured Claims are not entitled to vote on the Plan. Except to the extent previously paid in full, to the extent any Allowed Secured Claims exist, at the option of the Debtor or the Liquidating Trustee, as applicable, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction, release, and discharge of such Allowed Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtor or the Liquidating Trustee, as applicable, the Holder of such Secured Claim will receive a Cash payment equal to the amount of its Allowed Secured Claim in full satisfaction, release, and discharge of such Secured Claim; or (iii) the collateral securing the Creditor's Secured Claim shall be abandoned to such Creditor, in full satisfaction, release, and discharge of such Secured Claim.

Class 3 Claims - Convenience Claims. Class 3 consists of Convenience Claims. Class 3 is an Impaired Class and Holders of Claims are entitled to vote to accept or reject the Plan. On or as soon as practicable after the Effective Date, each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction of its Claim, Cash equal to 50% of the Allowed amount of such Claim, as calculated without interest from the Petition Date, and no such Holder will be entitled to any future distribution from the Liquidating Trust. Convenience Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtor, the Estate, and pursuant to the Plan, the Liquidating Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

The Debtor estimates that approximately $250,000 - $500,000 in Convenience Claims will ultimately be Allowed Class 3 Claims. Allowed Class 3 Claims will receive a distribution of 50% on account of their Allowed Claims provided, however, that the aggregate amount of Distributions to Convenience Claims shall be limited to $250,000. To the extent that the amount of payment of Unsecured Claims electing to be treated as a Convenience Claim exceeds $250,000, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $250,000 cap is reached. Claims that are not selected for Convenience Claim treatment shall be treated as Unsecured Claims.

Class 4 Claims - Unsecured Claims. Class 4 consists of Unsecured Claims. Class 4 is an Impaired Class and Holders of Claims are entitled to vote to accept or reject the Plan. Each Holder of an Allowed Unsecured Claim in Class 4 shall receive a Pro Rata share of the Liquidating Trust Interests following the payment or reserve for Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims. Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtor, the Estate, and pursuant to the Plan, the Liquidating Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

Approximately $13,800,000 of Unsecured Claims have been filed against the Debtor's estate, and approximately $13,000,000 in Unsecured Claims was scheduled by the Debtor. The Debtor estimates that approximately $19,500,000 - $25,400,000 in Unsecured Claims will ultimately be Allowed Class 4 Claims. The Debtor anticipates that, after deduction of estimated wind down expenses, Allowed Class 4 Claims will receive a distribution of approximately 15% - 22% on account of their Allowed Claims.

Class 5 – Equity Interests. Holders of Equity Interests will receive no distribution under the Plan and therefore are deemed to have rejected the Plan. Accordingly, Holders of Equity Interests are not entitled to vote. Upon the Effective Date, the Equity Interests will be deemed cancelled and will cease to exist.

## C.   **Means for Implementation of the Plan**

### 1.   **Dissolution of Debtor**

From and after the Effective Date, the Debtor shall be dissolved, without any further action required on the part of the Debtor or the Debtor's officers, directors, interest holders, and/or any other parties; provided, however, the Liquidating Trustee in his or her discretion shall be authorized to take any and all actions necessary or desirable in relation to dissolution of the Debtor. On the Effective Date, the employment, retention, appointment and authority of all officers, directors, employees and professionals of the Debtor shall be deemed to terminate.

### 2.   **Appointment of the Liquidating Trustee**

The Debtor, after consultation with the Committee, will appoint the Liquidating Trustee prior to the filing of the Plan Supplement and the identity of the Liquidating Trustee will be disclosed in the Plan Supplement. From and after the Effective Date, professionals may be retained by the Liquidating Trustee without further need for documentation or Bankruptcy Court approval. All fees and expenses incurred by the professionals retained by the Liquidating Trustee following the Effective Date shall be paid by the Liquidating Trust from the Liquidating Trust Assets (after payment in full of all Allowed Administrative Claims) in accordance with the Liquidating Trust Agreement.

3.   **The Liquidating Trust**

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, inter alia, (a) administering the Liquidating Trust Assets, (b) prosecuting and/or resolving all Disputed Claims, (c) investigating and pursuing any Causes of Action the Debtor holds or may hold against any Entity, and (d) making all Distributions to the Beneficiaries provided for under the Plan. The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, and make timely Distributions to the Beneficiaries, and not unduly prolong the duration of the Liquidating Trust. Neither the Liquidating Trust nor the Liquidating Trustee shall be or shall be deemed a successor-in-interest of the Debtor for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Assets will be treated for tax purposes as being transferred by the Debtor to the Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Beneficiaries to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust. The Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtor's rights, title and interest in the Liquidating Trust Assets, and the Debtor will have no further interest in or with respect to the Liquidating Trust Assets.

Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidating Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidation Trust Assets. The valuation shall be used consistently by all parties (including, without limitation, the Debtor, the Liquidating Trust, and the Beneficiaries) for all federal income tax purposes.

4.   **Rights and Powers of the Liquidating Trustee**

The Liquidating Trustee shall be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules to act on behalf of the Liquidating Trust. Without limiting the foregoing, the Liquidating Trustee will

have the right to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate the Liquidating Trust Assets; (3) investigate, prosecute, settle, abandon or compromise any Causes of Action the Debtor holds or may hold against any Entity; (4) make Distributions as contemplated hereby, (5) establish and administer any necessary reserves for Disputed Claims that may be required; (6) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (7) assert or waive any attorney-client privilege on behalf of the Debtor and Estate with regard to acts or events during time periods prior to the Petition Date; and (8) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtor or the Committee in accordance with the Liquidating Trust Agreement or the Plan, *provided, however*, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

5.    **Fees and Expenses of the Liquidating Trust**

Subject to payment in full of all Allowed Administrative Claims, and except as otherwise ordered by the Bankruptcy Court, expenses incurred by the Liquidating Trust on or after the Effective Date shall be paid in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court.

6.    **Transfer of Beneficial Interests in the Liquidating Trust**

Liquidating Trust Interests shall not be transferable except upon death of the interest holder or by operation of law. The Liquidating Trust shall not have any obligation to recognize any transfer of Claims or Equity Interests occurring after the Distribution Record Date.

7.    **Available Cash**

On or as soon as practicable following the Effective Date, the Liquidating Trust Assets Account shall be opened by the Liquidating Trustee and funded with the Available Cash to the extent of any unencumbered Cash, which funds shall constitute Liquidating Trust Assets. Thereafter, from time to time, upon receipt of any Liquidation Proceeds or any Litigation Recovery, the Liquidating Trustee shall deposit such funds into the Liquidating Trust Assets Account, and they shall become part of the Liquidating Trust Assets.

8.    **Litigation**

Except as otherwise provided in the Plan, all Litigation is retained, vested in the Liquidating Trust, and preserved pursuant to Section 1123(b) of the Bankruptcy Code.  From and after the Effective Date, all Litigation will be prosecuted or settled by the Liquidating Trustee. To the extent any Litigation is already pending on the Effective Date, the Liquidating Trustee, as successor to the Debtor or the Committee (in any derivative capacity or as an intervening party), will continue the prosecution of such Litigation and shall be substituted as plaintiff, defendant, or

in any other capacity for the Debtor or the Committee pursuant to the Plan and the Confirmation Order on the Effective Date without need for any further motion practice or notice in any case, action, or matter.

9.      **Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to Section II(C) of the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent the Liquidating Trustee or to be compensated or reimbursed per the Plan and the Liquidating Trust Agreement in connection with such representation.

10.     **Full and Final Satisfaction**

Commencing upon the Effective Date, subject to the terms of the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized and directed to distribute the amounts required under the Plan to the Holders of Allowed Claims according to the provisions of the Plan. Upon the Effective Date, all Debts of the Debtor shall be deemed fixed and adjusted pursuant to the Plan, and the Liquidating Trust shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Liquidating Trust Agreement. All payments and all distributions made by the Liquidating Trustee under the Plan shall be in full and final satisfaction, settlement, and release of all Claims against the Liquidating Trust; *provided, however*, that nothing contained in Section V of the Plan, or in any other provision of the Plan, shall be deemed to constitute or result in a discharge of the Debtor under Bankruptcy Code Section 1141(d).

11.     **Distribution Procedures**

The Liquidating Trustee shall make Distributions to Holders of Claims as provided in Article III of the Plan. Subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee may, in its sole discretion, make a full or partial Pro Rata Distribution to the Holders of Class 4 Unsecured Claims on the Initial Distribution Date or a Subsequent Distribution Date.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Liquidating Trust for Distribution on any Subsequent Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. The Liquidating Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Liquidating Trustee as of the Distribution Record Date.

Checks issued by the Liquidating Trustee on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to this Article shall be made directly to the Liquidating Trustee by the Holder of the Allowed Claim to which the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of six months from the Effective Date or 90 days after the date of issuance thereof. After that date, all Claims in respect of voided checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the Liquidating Trust as unclaimed property in accordance with Section 347(b) of the Bankruptcy Code.

12.    **Liquidating Trust Assets Account**

Unless otherwise provided in the Confirmation Order, the Liquidating Trust Assets Account shall be invested by the Liquidating Trustee in a manner consistent with the objectives of Section 345(a) of the Bankruptcy Code and in its reasonable and prudent exercise of discretion. The Liquidating Trustee shall have no obligation or liability to Beneficiaries in connection with such investments in the event of any unforeseeable insolvency of any financial institution where such funds are held.

13.    **Resolution of Disputed Claims**

Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not Distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed. Nothing contained herein, however, shall be construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Liquidating Trustee shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims. The costs of pursuing the objections to Claims shall be borne by the Liquidating Trust. From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent the Liquidating Trustee elects to withdraw any such objection or the Liquidating Trustee and the Claimant elect to compromise,

settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Equity Interest without approval of the Bankruptcy Court.

All objections to Disputed Claims shall be filed and served upon the Claimant not later than the Claims Objection Deadline, as such may be extended by the Bankruptcy Court. If and when the Liquidating Trustee ever determines that there is likely to be remaining Liquidation Proceeds realized by the Liquidating Trust after the payment in full of all Liquidating Trust expenses, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, and Allowed Unsecured Claims, with interest accrued from and after the Petition Date, the Liquidating Trustee will file a notice to this effect with the Bankruptcy Court.

Except as otherwise agreed, any and all proofs of claim filed after the Bar Date shall be deemed disallowed as of the Effective Date without any further notice or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed; *provided, however*, that such Claims shall be deemed Allowed (unless Disputed) after the payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Claims, Allowed Priority Non-Tax Claims, Allowed Convenience Claims and all Allowed Unsecured Claims. For the avoidance of doubt, Holders of Equity Interests shall not be paid from the Liquidating Trust unless and until the full payment of all Allowed Claims for which a proof of claim was filed after the Bar Date.

Any Claims held by Entities from which property is recoverable under Sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Liquidating Trust, shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action holds or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Entity have been turned over or paid to the Debtor or Liquidating Trust.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register at the direction of the Debtor or the Liquidating Trustee, as applicable, without an objection filed and without further notice to or action, order, or approval of the Bankruptcy Court.

14.    **Reserve Provisions for Disputed Claims**

On or an Distribution Date, the Liquidating Trustee shall reserve Cash required for distribution on Disputed Claims as if such Claims were Allowed as filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee (the "Disputed Claim Reserve"). On each Distribution date after the

Effective Date in which the Liquidating Trustee makes Distributions to Holders of Allowed Claims, the Liquidating Trustee shall retain on account of Disputed Claims an amount the Liquidating Trustee estimates is necessary to fund the Pro Rata Share of such Distributions to Holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee.

The Liquidating Trust shall hold property in the Disputed Claim Reserve in trust for the benefit of the Holders of Disputed Claims that are ultimately determined to be Allowed. Each Disputed Claim Reserve shall be closed and extinguished by the Liquidating Trust when all Distributions and other dispositions of Cash of other property required to be made hereunder will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Claim Reserve, all Cash or other property held in that Disputed Claim Reserve shall revest in and become unrestricted property of the Liquidating Trust. All funds or other property that vest or revest in the Liquidating Trust pursuant to this paragraph shall be used to pay by the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

### D.    Unexpired Leases and Executory Contracts

Except with respect to executory contracts or unexpired leases that: (i) were previously assumed or rejected by order of the Bankruptcy Court, and (ii) are the subject of a pending motion to assume or reject, pursuant to Section 365 of the Bankruptcy Code, on the Effective Date, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code; *provided, however*, that nothing in Section VI.A of the Plan shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtor and the Estate; the Debtor's officers, directors and managers; and/or the Liquidating Trust. Nothing in Article VI of the Plan shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and neither the Debtor nor the Liquidating Trust shall bear any liability for costs associated with such matters.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent within thirty (30) days after the earlier of the Effective Date or an order of the Bankruptcy Court approving such rejection. Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such times will be subject to objection. All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as Unsecured Claims subject to the provisions of Article III of the Plan.

Notwithstanding anything in the Plan to the contrary, confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the Insurance Policies. To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtor holds or may hold against any Entity, the Debtor shall, to the extent permissible under each Insurance Policy, assign all of its rights thereunder with respect to such Causes of Action to the Liquidating Trust. All net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of Insurance Policies received by the Liquidating Trust shall be treated as proceeds of such Causes of Action for all purposes under the Plan. The Debtor shall take no action to or otherwise impair the Insurance Policies. Nothing in the Plan shall diminish or impair the enforceability of the Insurance Policies and related agreements that may cover Claims and Causes of Action against the Debtor or any other Entity.

E.    **Conditions to Effectiveness**

The conditions to the confirmation and effectiveness of the Plan are set forth in Article VII of the Plan. In the event that the conditions specified in Section VII.A of the Plan have not occurred or been waived, the Debtor may withdraw the Plan and the Plan will be of no force or effect.

F.    **Effects of Confirmation**

Binding Effect of Plan. The provisions of the confirmed Plan shall bind the Debtor, the Liquidating Trust, the Liquidating Trustee, any Entity acquiring property under the Plan, any Beneficiary, and any Creditor or Equity Interest Holder, whether or not such Creditor or Equity Interest Holder has filed a Proof of Claim or Equity Interest in the Chapter 11 Case, whether or not the Claim of such Creditor or the Equity Interest of such Equity Interest Holder is impaired under the Plan, and whether or not such Creditor or Equity Interest Holder has accepted or rejected the Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in Bankruptcy Code Section 1146(a).

Vesting of Property of Debtor in the Liquidating Trust. Upon the Effective Date, title to all property of the Estate of the Debtor in the Chapter 11 Case shall vest in the Liquidating Trust and shall be retained by the Liquidating Trust for the purposes contemplated under the Plan pursuant to the Liquidating Trust Agreement. Without limiting the generality of the foregoing, all Causes of Action the Debtor holds or may hold against any Entity, Litigation Recoveries, rights to Liquidation Proceeds, and all resulting Trust Assets shall vest in the Liquidating Trust upon the Effective Date and shall no longer constitute property of the Estate.

Property Free and Clear. Except as otherwise provided in the Plan or the Confirmation Order, all property that shall vest in the Liquidating Trust shall be free and clear of all Claims, Equity Interests, Liens, interests, charges, or other encumbrances of Creditors or Interest Holders, other than as set forth herein, in the Liquidating Trust Agreement, and in relevant documents, agreements, and instruments contained in the Plan Supplement. Following the

Effective Date, the Liquidating Trustee may transfer and dispose of any such property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

**Exculpation.  The Debtor, the Committee and each of their respective officers, directors, shareholders, members, managers, employees, agents, advisors, accountants, attorneys, and representatives and their respective property, will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken after the Petition Date in connection with or related to the Chapter 11 Case, the sale of the Debtor's assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan;** *provided, however,* **that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction);** *provided* **that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form an absolute defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code.  Except as specifically set forth in Section VIII.E of the Plan, no provision of the Plan or the Disclosure Statement shall be deemed to act to or release any claims, Causes of Action, Litigation claims or rights, or liabilities that the Liquidating Trust or the Estate may have against any Entity or person for any act, omission, or failure to act that occurred prior to the Petition Date, nor shall any provision of the Plan be deemed to act to release any Causes of Action, Litigation, or Litigation claims.**

**Debtor's Release.  Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtor and its estate shall release each Released Party, and each Released Party is deemed released by the Debtor and the estate from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor or its estate, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or the estate would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's liquidation, the Chapter 11 Case, the purchase, sale, transfer of any security, asset, right, or interest of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests**

prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Petition Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct, or gross negligence; provided, that the foregoing Debtor Release shall not operate to waive or release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtor or its estate asserting any Claim or Cause of Action released pursuant to the Debtor Release.

Third Party Release.  On and after and subject to the occurrence of the Effective Date, except as otherwise provided in the Plan, each Claimant (collectively, the "Releasing Parties") who affirmatively votes to accept the Plan and who does not elect to "opt-out" by marking the appropriate box on such Releasing Party's respective Ballot, for themselves and their respective successors, assigns, transferees, and such Claimants' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), shall release (the "Third Party Release") each Released Party, and each of the Debtor, its estate, and the Released Parties shall be deemed released from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtor or its estate, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's liquidation, the Chapter 11 Case, the purchase, sale, transfer of any security, asset, right, or interest of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Petition Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence. Notwithstanding anything to the

contrary in the foregoing, the **Third Party Release** shall not release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan.

**Injunction.** In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtor, the Liquidating Trust, or the Estate that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtor, the Estate, the Liquidating Trust, or any of the Liquidating Trust Assets, the Debtor, or the Estate with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtor, the Estate, the Liquidating Trust, or any of the Liquidating Trust Assets, the Debtor, or the Estate with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtor, the Estate, or the Liquidating Trust, or any of the Liquidating Trust Assets, the Debtor, or the Estate with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in this Section shall prohibit the Holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtor or the Liquidating Trust under the Plan.

Post-Confirmation Liability of Liquidating Trustee. The Liquidating Trustee, together with his or her consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing shall not be liable for any and all liabilities, losses, damages, claims, causes of action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Equity Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that are grossly negligent, fraudulent, or which constitute willful misconduct (in each case, liability shall be subject to determination by final order of a court of competent jurisdiction). However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence, fraud or willful misconduct. In addition, the Liquidating Trust and the Estate shall, to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust and the Estate or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Liquidating Trust and the Estate. To the extent the Liquidating Trust indemnifies and holds

harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidating Trust Expenses. All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

No Discharge. Nothing contained in the Plan shall be deemed to constitute a discharge of the Debtor under Bankruptcy Code section 1141(d)(3).

## G.    **Preservation of Rights of Action**

Vesting of Causes of Action. Except as otherwise provided in the Plan or Confirmation Order, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor holds or may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust. Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action the Debtor holds or may hold against any Entity, in accordance with the terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case. Causes of Action and recoveries therefrom shall remain the sole property of the Liquidating Trust, for the ratable benefit of the Beneficiaries of the Liquidating Trust, and holders of Claims shall have no direct right or interest in to any such Causes of Action or recovery.

Preservation of All Causes of Action Not Expressly Settled or Released. Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan an or any Final Order (including the Confirmation Order), the Debtor and the Liquidating Trustee expressly reserve such retained Cause of Action for later adjudication by the Debtor or the Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtor may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time, or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order).  In addition, the Debtor and Liquidating Trustee expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which the Debtor is a defendant or an interested party against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits. Subject to the foregoing, any Entity to which the Debtor has incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtor or a transfer of money or property of the Debtor, or that has received services from the Debtor or a transfer or money or property of the Debtor, or that has transacted business with the Debtor, or that has leased equipment or property from the Debtor, should assume and is hereby

advised that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof of claim against the Debtor in the Chapter 11 Case; (ii) the Debtor or Liquidating Trustee has objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtor or Liquidating Trustee has objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtor or Liquidating Trustee as disputed, contingent, or unliquidated; or (vi) the Debtor has identified any potential claim or Cause of Action against such Entity herein or in the Plan.

## H.   Retention of Jurisdiction

Following the Confirmation Date, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the purposes described in Article IX of the Plan.

## IV.
## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtor, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Debtor has complied with applicable provisions of the Bankruptcy Code, (iv) the Debtor has proposed the Plan in good faith and not by any means forbidden by law, (v) the disclosure required by Section 1125 of the Bankruptcy Code has been made, (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under Section 1129(b) of the Bankruptcy Code), (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, (viii) the Plan is in the "best interests" of all holders of Claims or Equity Interests in an impaired Class by providing to such holders on account of their Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless the Holder has accepted the Plan, and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

## A.   Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only classes of claims and interests that are "impaired" (as defined in Section 1124 of the Bankruptcy Code) under the plan are entitled to vote to accept or reject the Plan. A class is impaired if the legal, equitable, or contractual rights to which the claims or equity interests of that class entitled the holders of such claims or equity interests are modified, other than by curing defaults and reinstating the debt. Classes of claims and interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan. In addition, classes of claims and interests that receive no distributions under the plan are not entitled to vote on the plan and are deemed to have rejected the plan.

**B.**    **Classes Impaired Under the Plan**

Class 3 (Convenience Claims), Class 4 (Unsecured Claims) and Class 5 (Equity Interests) are Impaired under the Plan.  Acceptances of the Plan are being solicited only from members in Impaired Classes that will or may receive a distribution under the Plan.  Accordingly, the Debtor is soliciting acceptances from members of Class 3 and Class 4 only.  Class 5 is receiving no distribution under the Plan and is therefore deemed to reject the Plan.

**C.**    **Voting Procedures and Requirements**

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement.  In addition, you may vote to opt out of the releases provided under the Plan to the Released Parties.

If you are a member of Class 3 and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please call Debtor's voting agent, Kurtzman Carson Consultants, LLC, at (888) 733-1431.  PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.

YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE TO:

**Aquion Energy, Inc. Ballot Processing Center**
**c/o KCC**
**2335 Alaska Avenue**
**El Segundo, California 90245**

VOTES CANNOT BE TRANSMITTED ORALLY.  FACSIMILE BALLOTS WILL NOT BE ACCEPTED.  TO BE COUNTED, ORIGINAL SIGNED BALLOTS MUST BE RECEIVED ON OR BEFORE [——————————]DECEMBER 12, 2017, AT 4:00 P.M., PREVAILING EASTERN TIME.  IT IS OF THE UTMOST IMPORTANCE TO THE DEBTOR THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.

**D.**    **Confirmation Standards**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor has complied with the applicable provisions of the Bankruptcy Code.
- The Plan has been proposed in good faith and not by any means forbidden by law.
- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.
- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on that date under chapter 7 of the Bankruptcy Code.
- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.
- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Holders of Claims specified in section 507(a)(2) will receive, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtor or the Liquidating Trustee, as the case may be; (c) with respect to any Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), such fees will be paid as and when due under applicable law.
- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that the Liquidating Trustee shall pay Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code the full unpaid amount of such Allowed Claim on the earliest of the following dates: (i) on or as soon as practicable after the Effective Date, (ii) on or as soon as practicable after the date such Claim becomes an Allowed Claim, and (iii) the date such Allowed Claim is payable under applicable non-bankruptcy law.
- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.
- Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtor has paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

## E.    **Best Interests Test**

In order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any such impaired Class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

## F.    **Liquidation Analysis**

In this case, the Debtor has sold substantially all of its assets, resulting in approximately $6,800,000 in net liquidation proceeds presently remaining for distribution to creditors holding Allowed Administrative, Priority, Secured, Convenience and Unsecured Claims against the Debtor's Estate. Based upon the Debtor's current projections, Holders of Allowed Administrative, Priority and Secured Claims will be paid in full under the Plan, while Holders of Allowed Convenience Claims will receive a distribution of 50% and Holders of Allowed Unsecured Claims will receive a projected distribution of approximately 15% - 22%.

If the Chapter 11 Case were converted to a Chapter 7 case, the Debtor's estate would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtor believes that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtor in its Chapter 11 Case. The Debtor contemplates an orderly administration and winding down of the Estate by parties that are already familiar with the Debtor, its assets and affairs, and its creditors and liabilities. Such familiarity will allow the Liquidating Trust to complete liquidation of the remaining assets (including prosecution of Causes of Action), and distribute the net proceeds to creditors more efficiently and expeditiously than a Chapter 7 trustee. Additionally, the Estate would suffer additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the Estate (including the prosecution of Causes of Action). Also, a new time period for the filing of claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estate.

Based upon the foregoing, the Debtor believes that creditors will receive at least as much under the Plan and likely more, than they would receive if the Chapter 11 Case were converted to a Chapter 7 case.

## G.    Feasibility

Under Section 1129(a)(11) of the Bankruptcy Code, the Debtor must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Plan). The Plan clearly complies with this requirement because all of the Debtor's remaining assets will be liquidated or otherwise disposed of and the proceeds thererof will be distributed to creditors pursuant to the terms of the Plan. Furthermore, feasibility under Section 1129(a)(11) is supported by the liquidation analysis in Article IV, Section F, of this Disclosure Statement.

## H.    Acceptance by Impaired Classes.

Bankruptcy Code § 1129(b) provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. The process by which nonaccepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan. A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (1) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified, or (2) the effect of any default is cured and the original terms of the obligation are reinstated.

A plan is fair and equitable as to a class of secured claims that rejects the plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the

proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

AS CLASS 5 INTERESTS ARE DEEMED TO REJECT THE PLAN, THE PLAN PROPONENTS INTEND TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS.  FURTHER, THE PLAN PROPONENTS WILL REQUEST CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) WITH RESPECT TO ANY OTHER IMPAIRED CLASS ENTITLED TO VOTE ON THE PLAN THAT DOES NOT ACCEPT THE PLAN.

## I.        Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  The Debtor has considered each of these issues in the development of the Plan and believes that the Plan complies with all applicable provisions of the Bankruptcy Code.

AS CLASS 5 EQUITY INTERESTS ARE DEEMED TO REJECT THE PLAN, THE DEBTOR INTENDS TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE

## V.
## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords Holders of Claims the potential for the maximum distribution on account of their claims and, therefore, is in the best interests of such Holders.  If the Plan is not confirmed, the only viable alternatives are dismissal of the Chapter 11 Cases or conversion to Chapter 7 of the Bankruptcy Code.  For the reasons described herein, neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Case were dismissed, creditors would revert to a "race to the courthouse," the result being that creditors would not receive a fair and equitable distribution of the Debtor's remaining assets. Moreover, as set forth above, the Debtor believes the Plan provides a greater recovery to creditors than would be achieved in a Chapter 7 case. Therefore, a Chapter 7 case is not an attractive or superior alternative to the Plan. Thus, the Plan represents the best available alternative for maximizing returns to creditors.

## VI.

## **RISK FACTORS**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

A.    **Risks Relating to Confirmation and Consummation of the Plan**

1.    **Parties in Interest May Object to Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

2.    **The Debtor May Object to a Claim or Equity Interest**

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim or Equity Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or

other suit by the Debtor. Any Holder of a Claim or Equity Interest that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

3.      **The Debtor May Fail to Satisfy the Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan.

4.      **Plan May Not Be Accepted, Confirmed or Consummated**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

The Debtor reserves the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Section 1127 of the Bankruptcy Code permits the Debtor to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation. The Debtor may modify the Plan at any time after confirmation of the Plan and before substantial consummation

of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation. The Debtor will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan. Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

### 5.    Non-Consensual Confirmation of the Plan May Be Necessary

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) ("Accepting § 1129(a)(10) Class") and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If there is an Accepting § 1129(a)(10) Class, the Debtor believes that the Plan satisfies these other requirements and the Debtor may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### B.    Risks Relating to the Chapter 11 Process

### 1.    The Debtor's Exclusivity Period May Terminate

At the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor will have retained the exclusive right to propose the Plan upon filing their petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

### 2.    Continuation of the Chapter 11 Case May Harm the Debtor's Estate

A prolonged continuation of this Chapter 11 Case may adversely affect the Debtor's estate. So long as the Chapter 11 Case continues, the Debtor may be required to incur substantial costs for professional fees and other expenses associated with the proceedings.

### 3.    The Chapter 11 Case May Be Converted to Cases Under Chapter 7

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a

case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than liquidating in a controlled manner through the Liquidating Trust and (b) additional administrative expenses involved in the appointment of a chapter 7 trustee.

### C.    Risks Relating to Recoveries Under the Plan

The projected distributions set forth in this Disclosure Statement are based upon the Debtor's good-faith estimate of the amount of expenses that will be incurred and total amount of Claims in each Class that will ultimately be Allowed. The actual amount of such expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving Disputed Claims. Additionally, the actual amount of Allowed Claims in any class could be greater than anticipated, which would impact the distributions to be made to Holders of Claims.

## VII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF TAX ADVICE FROM, A TAX PROFESSIONAL. THE SELECTED FEDERAL TAX CONSEQUENCES THAT ARE DESCRIBED HEREIN AND OTHER FEDERAL, STATE AND LOCAL TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH TAX CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS STRONGLY ADVISED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN. THE BELOW SUMMARY OF TAX CONSEQUENCES IS NOT INTENDED TO BE AND IS NOT TAX ADVICE.

THE DEBTOR DOES NOT INTEND TO REQUEST A TAX RULING FROM THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN. CONSEQUENTLY, THE INTERNAL REVENUE SERVICE OR ANOTHER TAXING AUTHORITY MAY DISAGREE WITH AND MAY CONTEST ONE OR MORE OF THE TAX CONSEQUENCES DESCRIBED HEREIN TO THE DEBTOR, HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS.

A.    **Federal Income Tax Consequences to Certain Creditors**

    1.    **In General**

    Generally, a holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

    A creditor who received Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

    Under the Plan, the holders of certain Claims will likely receive only a partial distribution of their Allowed Claims. As discussed herein, members of Class 3 (Convenience Claims) will receive a 50% payment in Cash for the value of their Allowed Claims, and Class 4 (Unsecured Claims) will receive a Pro Rata share of the Liquidating Trust Interests in exchange for their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors.

    2.    **Non-United States Persons**

    A holder of a Claim that is a Non-U.S. Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such holder is an individual, such holder is present

in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

3.     **Tax Consequences in Relation to Liquidating Trust**

As of the Effective Date, the Liquidating Trust will be established for the benefit of the holders of certain Allowed Claims.  The tax consequences of the Plan in relation to the Liquidating Trust and the beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to the Liquidating Trust's claims reserves) among holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.  Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtor.  All parties (including, without limitation, the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing.

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS

ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Liquidating Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) are required to treat for federal income tax purposes, the Liquidating Trust as a grantor trust of which the holders of the applicable Allowed Claims are the owners and grantors. While the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the beneficiaries thereof could materially vary from those discussed herein.

In general, each creditor who is a beneficiary of the Liquidating Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such beneficiary in satisfaction of its applicable Allowed Claim, and (ii) such beneficiary's adjusted tax basis in such Claim. The "amount realized" by a beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a beneficiary's undivided beneficial interest in the assets transferred to the Liquidating Trust). Where gain or loss is recognized by a beneficiary in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Liquidating Trust.

In general, a beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidating Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the beneficiary's holding period in such assets will begin the day following the Effective Date. Distributions to any beneficiary will be allocated first to the original principal portion of the beneficiary's Allowed Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) will treat the transfer of assets to the Liquidating Trust, in accordance with the terms of the Plan and Liquidating Trust Agreement, as a transfer of those assets directly to the holders of the applicable Allowed Claims followed by the

transfer of such assets by such holders to the Liquidating Trust. Consistent therewith, all parties will treat the Liquidating Trust as a grantor trust of which such holders are to be owners and grantors. Thus, such holders (and any subsequent holders of interests in the Liquidating Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidating Trust for all federal income tax purposes. Accordingly, each holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.

The Liquidating Trust's taxable income will be allocated to the holders of beneficial interests in the Liquidating Trust in accordance with each such holder's *pro rata* share. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligation of a holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidating Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidating Trust will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

## B.    **Information Reporting and Backup Withholding**

Distributions pursuant to the Plan will be subject to any applicable federal income tax reporting and withholding. The IRC imposes "backup withholding" on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a Claim may be

required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## VIII.

## RECOMMENDATION

The Debtor strongly recommends that all creditors receiving a Ballot vote in favor of the Plan. The Debtor believes that the Plan is in the best interests of creditors. In addition, the Committee supports the Plan and encourages all creditors to vote for the Plan. The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Case dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTOR BELIEVES THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTOR URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. ~~PACIFIC~~ EASTERN STANDARD TIME ON [~~—————————~~]DECEMBER 12, 2017.

Dated: ~~October 19~~November 9, 2017                    Respectfully submitted,

_____

AEI WINDDOWN, INC.
By: Suzanne Roski, its Chief Restructuring Officer

*Solicitation Version*

# EXHIBIT A

# (THE PLAN)